IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 8, 2000 Session

## STATE OF TENNESSEE V. JAMES M. WILLIAMS

### Appeal from the Criminal Court for Shelby County

### No. 96-07865     Arthur T. Bennett, Judge

_____

### No. W1999-01458-CCA-R3-CD - Filed January 9, 2001

_____

This appeal arises from the sentence that the Shelby County Criminal Court imposed upon James M. Williams, after a previous appeal to this court resulted in a modification of his original two-year incarcerative sentence to a sentence ordered to be served on probation. The defendant contests the trial court's authority to resentence him to serve 60 days in a correctional facility, with the balance of his two-year sentence to be served on probation. The defendant also challenges his new sentence as the product of judicial vindictiveness, and he claims that he is entitled to full probation based on the facts of the case. After a review of the record, we reverse the split-confinement sentence, order that the defendant serve his sentence on full probation with conditions, and remand for defendant to begin immediate service of his sentence.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed and Vacated, Sentences Modified and cause Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert M. Brannon and Thomas E. Hansom, Memphis, Tennessee, for the appellant, James M. Williams.

Michael E. Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; Perry Hayes, Assistant District Attorney General; and Tom Henderson; Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

James M. Williams appeals and challenges the Shelby County Criminal Court's determination that he is not entitled to full probation on his two-year sentence for leaving the scene

of an accident involving death, a Class E felony. Previously, this court had modified the trial court's sentence that denied the defendant any form of alternative sentencing. Upon remand, and despite instructions from this court that the defendant's sentence was to be served on probation, the trial court ordered the defendant's incarceration in a correctional facility for 60 days of his two-year sentence. The defendant raises three issues on this appeal regarding the trial court's imposition of a sentence of split confinement. They are:

1. Did the trial court err by granting the state's motion requesting a hearing on probation after the Court of Criminal Appeals had remanded the case for the defendant to be placed on full probation?

2. Did the trial court err by sentencing the defendant to a vindictive sentence upon his successful appeal to the Court of Criminal Appeals?

3. Did the trial court err in denying the defendant full probation?

After reviewing the record on appeal, the briefs of the parties, and the applicable law, we modify the defendant's split-sentence and order that he serve his sentence on full probation.

## I. Trial and Direct Appeal

This is the second occasion that the court has been called upon to review the defendant's sentence arising from his felony conviction for leaving the scene of an accident involving death. In 1996, the defendant, then a twenty-one-year veteran officer with the Memphis Police Department, was charged with vehicular homicide, driving while under the influence of an intoxicant, reckless driving, and leaving the scene of an accident involving death. At the conclusion of a jury trial, the defendant was found not guilty of all charges except for leaving the scene of an accident. We adopt the following statement of facts from the court's earlier opinion on direct appeal, *State v. James M. Williams*, No. 02C01-9710-CR-00388 (Tenn. Crim. App., Jackson, Jan. 5, 1999), *perm. app. denied* (Tenn.1999):

On July 29, 1995, shortly before 4:00 p.m., the Defendant drove an automobile which struck and killed the victim, Bobby E. Russell, Jr., on a residential country road in Shelby County, Tennessee. At the time he was struck and killed, the victim had been using a gas-operated weed-eater along the edge of the front yard of his residence near the roadway. The victim apparently was either standing in the roadway or stepped into the roadway in the path of the vehicle the Defendant was operating. There was no evidence that the Defendant's vehicle left the roadway or that the Defendant was speeding at the time his vehicle struck the victim. The speed limit on

the road at the scene of the accident was forty-five miles per hour, and all the proof indicated that the Defendant was traveling within the speed limit. The surface of the roadway was dry, and the Defendant apparently did not apply his brakes prior to the impact with the victim. Testimony indicated that there were patches of shade and sunshine alternating along that portion of the roadway on that afternoon. The Defendant testified that he never saw the victim prior to the impact.

At the time of the accident, the Defendant was a twenty-one-year veteran of the Memphis Police Department who had attained the rank of major. Although off-duty, he was driving the unmarked police department vehicle assigned to him. The force of the impact of the victim's body with the Defendant's car was quite severe. The hood of the vehicle on the passenger side was substantially damaged, and the entire passenger side of the front windshield was shattered. Although the windshield remained substantially intact, some glass from the windshield shattered onto the front seat of the vehicle. The victim's body was thrown approximately forty-nine feet by the impact.

Immediately after the impact, although the Defendant apparently slowed his vehicle to a stop or near-stop, it is undisputed that he then drove further, eventually traveling about a mile to his own driveway. The Defendant testified that after the impact, he was covered by glass, and he thought he had possibly struck his head on the steering wheel. He said that he stopped and immediately picked up his police radio to attempt to get help because he knew then that he had hit a person and that emergency medical help would be needed. He said that he also attempted to use a cellular phone but that he could not get a response by using either the radio or the phone. He then assumed that he was in a "dead spot" insofar as using the phone or radio, so he proceeded up the road, continuously attempting to summon emergency assistance by radio and phone. He said that when he got to his house, he was still unable to establish contact by way of radio or cell phone and that he was going to go into his house to use the phone to summon help. He then heard a siren in the distance, assumed that perhaps he had in fact been successful in getting help on the way, and immediately drove back to the scene of the accident. The testimony presented varied the length of time between the impact and the arrival of the Defendant back at the accident scene from five to fifteen or twenty minutes. According to records maintained by the Shelby County Sheriff's Department

dispatcher, the first call came at 3:58 p.m., and a call was received from the Defendant at 4:08 p.m. Several witnesses testified that the Defendant was apparently attempting to use his radio and/or his cellular phone after he returned to the accident scene.

Dell Russell, the widow of the victim, was working in the yard near her husband when she heard the impact. She immediately ran to the house and called 911 for emergency help. She testified that it was perhaps fifteen minutes before the Defendant's vehicle returned to the scene, although in a previous statement she had estimated the time at five to ten minutes.

Franklin Perry Cathey, who was the victim's friend, brother-in-law, and neighbor, was among the first to arrive on the scene of the accident. He was a fireman who had some emergency medical training, and he and another person attempted to revive the victim. Mr. Cathey knew that the injuries were very serious and said the victim never regained consciousness. The Defendant arrived back at the scene while Mr. Cathey was there. Mr. Cathey said the Defendant was outside his car "punching on his telephone," and that he asked the Defendant to call for an emergency medical helicopter. He said that the Defendant told him that he could not get a signal.

Mr. Cathey's son, Russell Cathey, also arrived on the scene shortly after the accident. He knew the Defendant because he had played on a high school football team with the Defendant's son. He said the Defendant drove up while he was there and he saw him talking on his radio. He asked the Defendant to try to get them some help and the Defendant responded, "I'm trying. I'm trying." He testified that he smelled alcohol on the Defendant. The witness was about eighteen years old at the time of the accident. He said that he asked the Defendant if he had been drinking and the Defendant told him that he " 'had a couple of beers at eleven o'clock.' " The witness said, "I'll say he was pretty much heavily intoxicated." The witness acknowledged that he did not tell anyone at the scene that he believed the Defendant was impaired due to intoxication. He said that it was not until sometime later at a "family meeting" with his family lawyer that he told them he had smelled alcohol and thought that the Defendant's ability to operate a vehicle was impaired.

Dorothy Burk was near the accident scene at the time of the accident. She heard the impact and saw the Defendant's vehicle leaving the scene "very fast." Later, at the scene, she said that she

heard the Defendant tell Russell Cathey that he "'had a drink earlier and another one, but I'm not drunk.'"

Michael Barry Cole, a fireman with the Shelby County Fire Department, arrived at the scene in response to the emergency call for assistance. He and two co-workers joined the effort to help the victim. He said the victim was "in very bad, bad shape, real bad shape." He could find no vital signs. He said the Defendant approached him and asked if the victim was going to make it, and he advised the Defendant that he did not think he was. He said the Defendant was very calm, but was smoking cigarettes and chewing bubble gum. He said he detected an odor of alcohol about the Defendant but that he did not form an opinion concerning whether the Defendant was under the influence of an intoxicant. He worked with the victim until the helicopter arrived and the victim was transported to the hospital. Larry Crawford, another fireman who arrived with Cole in response to the emergency call, did not talk with the Defendant or observe him closely but did see him at a distance. He stated that by the way the Defendant was walking, he "could have been" under the influence of an intoxicant.

John Scott Harper, a patrolman with the Shelby County Sheriff's Office, was the first law enforcement officer to arrive at the scene. He was approached by the Defendant who introduced himself as Major Williams with the City Police Department. Patrolman Harper apparently did not know the Defendant prior to this time. He said the Defendant told him that he was the one involved in the accident. He said the Defendant told him that he had attempted to raise his dispatcher on the radio and to use his cellular phone, but he could not make contact. Therefore, he went home to call law enforcement and medical personnel and then returned to the scene. Harper said he noticed that the Defendant had bloodshot eyes and that while the Defendant was in his patrol car, he noticed a "slight smell of intoxicant on him." He transported the Defendant downtown after he was charged.

On cross-examination, the officer testified that he did not believe the Defendant's driving ability was impaired. He stated that while he was taking the Defendant downtown, the Defendant told him that he had been drinking late into the hours of the night before. This officer signed the affidavit of complaint charging the Defendant with DUI, reckless driving, and leaving the scene of an accident, but he testified that he was ordered to place these charges against the

-5-

Defendant. He was not asked and did not say who ordered him to charge the Defendant.

Memphis Police Officer Donald Leon Goldsby, Jr. testified that at the time of this accident he was assigned to the Metro DUI Squad, which was a combined unit of the Memphis Police Department and the Shelby County Sheriff's Office. He was dispatched to the scene of the crime. At that time he had known the Defendant for about twenty years, had worked with him in the Memphis Police Department, and considered the Defendant a friend. Because of his relationship with the Defendant, he objected to being asked to investigate the Defendant on a charge of DUI. He told his supervisors that he did not feel comfortable about testing the Defendant. He told them that he believed it was inappropriate for him to do the testing. Nevertheless, he was ordered to do the testing.

Officer Goldsby activated a video camera and filmed the Defendant as he was questioned and interviewed and as he performed field sobriety tests. He testified that the Defendant's eyes were red and watery and that he did notice an odor of an intoxicant. He recorded on the form he was filling out at the time that he believed any effect of alcohol on the Defendant was "very slight." On the form, he checked that the odor of alcohol was "faint," that the Defendant's attitude was "cooperative and polite," and that his speech was normal. He testified that his eyes were normal on the nystagmus test. He said the Defendant declined to take a breath-alcohol test. The jury viewed the video tape of the questioning and testing of the Defendant, including a "one leg stand" and a "toe to heel walk." The witness testified that in his opinion the Defendant's ability to drive was not impaired.

Accident reconstruction experts testified that the speed of the Defendant's vehicle was approximately forty to forty-five miles per hour at the time of the accident. The speed limit on the road was forty-five miles per hour.

The State presented prior sworn testimony that had been given at a General Sessions Court proceeding by a witness who was in the area doing construction work on the day of the accident. He testified that immediately after the impact, he observed the Defendant's vehicle speeding away from the scene at a high rate of speed and that he subsequently observed the Defendant at the scene and he believed the Defendant was "very impaired."

The Defendant presented several witnesses on his behalf. Justin Gates was about sixteen years old at the time of the accident and played football with the Defendant's son. He said that on the day of the accident, the Defendant came by his house at about one o'clock to bring some materials about a fund-raising project for the football team. He said that he and the Defendant talked and watched a football game on TV for about an hour. He said that the Defendant was not drinking at the time and did not give him any indication that he had been drinking or was impaired.

Lieutenant Sammy Jones testified that he had been with the Shelby County Sheriff's Department for about nineteen years. He arrived at the accident scene shortly after the accident and talked with the Defendant. He did not know the Defendant at that time. He said he called for the DUI investigation simply because someone told him that the Defendant had stated that he had had a beer and because the Defendant was a policeman.

An accident reconstruction expert employed by the Tennessee Highway Patrol also testified for the Defendant. He went to the accident scene the day after the accident occurred. His purpose in investigating this matter was to critique and review the investigative information gathered by the Shelby County Sheriff's Department. He expressed his opinion that the victim "had been weed eating the grass on the shoulder of the road and stepped back into the road into the path of the vehicle driven by the Defendant." He also opined that the Defendant's vehicle was traveling between forty and forty-five miles per hour. The Defendant introduced records from the Shelby County Sheriff's Office that indicated that the first call concerning the accident came in at 3:58 p.m. and that the first call from the Defendant was recorded at 4:08 p.m.

The Defendant testified in his defense. He joined the Memphis Police Department in 1974 as a patrolman. During the course of the next twenty years, he worked his way up through the ranks and was promoted to major in 1994 at the time he took over command of the auto theft division. He is married and has two children who are both adults. The accident occurred on a Saturday. He said that he got up at about 7:00 a.m. on that day, which was his day off. After having coffee and reading the paper, he went out and started working around his house. He mowed the yard, did some weed eating, and sprayed his dogs for ticks. After he finished cutting

the grass, he sat on his deck, throwing a ball for his dogs, and drank two beers. He did not drink any more alcoholic beverages that day.

About one o'clock, he got in his car and drove over to the Gates' residence to turn in some money that he had for the football team. He stayed there for about an hour talking with Justin Gates and watching a football game. He arrived back home at about 2:30 and flea-dipped his dogs. He then put some sacks of garbage in his patrol car and took them to a dumpster. When he was returning home around four o'clock, as he was driving through some intermittent shade and sunshine, his vehicle struck the victim. He said he did not see the victim until the body hit his windshield. The glass shattered and blew back in his face. He proceeded a little further, stopped and immediately reached for his car radio. His first thought was to get on the radio to try to get medical assistance. When he got no response, he thought he was in a "dead spot," so he proceeded along the roadway, trying to get someone to respond to his calls. He drove on to his house so that he could make a call there; and when he started to get out of the car, he heard a siren and went back to the scene of the accident. He said he was gone four to five minutes. When he got back to the accident scene, he continued to try to get a response on his radio and cell phone.

The Defendant said he refused the breathalyzer test because the type of machine used by the Memphis police was known to malfunction. He stated he did not want to participate in the test for that reason. He also confirmed that on the evening before the accident, ending at about midnight, he had drank a couple of beers.

On cross-examination, the Defendant admitted that he told Officer Goldsby that he had had nothing to drink that day, but he explained that he meant that he had not [had] anything immediately prior to the accident. He denied that his driving ability was impaired due to alcohol, denied any reckless driving, and insisted that the only reason he drove away from the scene of the accident was to try to find a place where his car radio or cellular phone would function.

*Id.*, slip op. at 2-11.

The jury received this evidence, deliberated, and returned a not-guilty verdict on all charges except the Class E felony of leaving the scene of an accident resulting in injury or death. *See* Tenn. Code Ann. § 55-10-101(b)(2) (1993).

The trial court subsequently conducted a sentencing hearing and received additional proof. The state offered victim-impact testimony from the victim's widow, his sister, his daughter, and his brother-in-law. The defendant presented character evidence, and he testified at sentencing. We adopt the following statement of facts from the court's earlier opinion on direct appeal regarding this sentencing hearing:

> The Defendant presented character evidence on his behalf. He was described as a "genuine, sincere, caring person." The witnesses described the Defendant's remorse over the accident. The Defendant was described as a good police officer, a good family man, conscientious, honest, caring, and generous.
>
> The Defendant testified that this event had "devastated" his life. He related that he had lost his job and his career, that he was earning much less than he had before, and that his family was on the verge of losing its home. He expressed his remorse and said that he would give anything if he could change what had happened. He said, "I'd give anything if he was a live [sic] today. I think about it sleeping and eating and getting up and I'm sorry. I'm sorry, but I can't bring him back."
>
> The presentence report reflected that at the time of sentencing, the Defendant was forty-four years of age and married with two children. He began employment with the Memphis Police Department immediately after graduating from college in 1974. His employment with the Memphis Police Department was terminated several weeks after the automobile accident. At the time of sentencing he was employed with Mid-South Graphics in Memphis with a salary of nine dollars an hour.

*Id.*, slip op. at 16-17.

The trial court summarily rejected the defendant's request for probation or other alternative sentencing without making an affirmative showing that the relevant sentencing principles had been considered; it sentenced the defendant to two years incarceration as a Range I standard offender. On direct appeal, this court did not afford the trial judge's sentencing determinations a presumption of correctness.

> The Defendant herein was convicted of a Class E felony and sentenced as a standard offender, and thus was entitled to the presumption that he is a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40-35-102(6). Because the record does not affirmatively show that the trial court considered these

sentencing principles, we review the sentence *de novo* without a presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

*Id.*, slip op. at 18-19.

Pursuant to the court's *de novo* review, the defendant's sentence was modified "to reflect that it shall be served on probation, with the terms and conditions of probation to be set by the trial judge." *Id.*, slip op. at 25.

## II. Remand and Re-sentencing

This court's opinion and judgment were filed on January 5, 1999. The supreme court denied the defendant's application for permission to appeal on June 21, 1999, and our court's mandate was filed in the trial court on July 12, 1999. Two weeks later the state filed a motion in the trial court requesting an evidentiary hearing to litigate whether probation should be approved and, if so, what conditions should be imposed.

Over the defendant's objection, the trial court scheduled a hearing on probation. At that hearing, the state presented evidence that the defendant was involved in a single vehicle accident in Shelby County on March 31, 1999, at a time when his Rule 11 application for permission to appeal was pending before the supreme court.

Martine Madlinger, an eyewitness to the accident, testified that she was driving on Old Brunswick Road, a difficult, two-lane road, when a truck passed her on the left. Ms. Madlinger was slowing down at the time because she was approaching a sharp curve in the road with a posted speed limit of fifteen miles per hour. As the truck entered the curve, it swerved and skidded, left the road, and rolled over into a ditch. Ms. Madlinger stopped her vehicle and flagged down a passing motorist.

The passing motorist, Richard O'Donnell, came upon the wrecked truck, which had come to rest upside down in the ditch. He crawled into the ditch and tried to open the truck door. Mr. O'Donnell could hear a person inside mumbling and moaning; he kicked in the window of the truck and could smell gasoline, and he could tell that the person inside was bleeding. Mr. O'Donnell helped the defendant to get out of the truck through the window. According to Mr. O'Donnell, once the defendant was out of the truck he stood up and then fell back against the creek bank. The defendant responded with "mumbling-type stuff" when Mr. O'Donnell tried to question him. Mr. O'Donnell climbed out of the ditch, left the defendant sitting on the bank, and departed after deputy sheriffs began arriving on the scene.

Mr. O'Donnell was questioned about the defendant's sobriety. Previously, in a statement to law enforcement, he described smelling alcohol in the cab of the truck. He had denied at that time smelling alcohol on the defendant's breath, and he voiced his opinion that the defendant

could have been staggering either because he was under the influence or because he was injured. In contrast, at the hearing, Mr. O'Donnell testified that the defendant smelled like a drunk and that the defendant's breath, clothes and truck cab smelled of alcohol.

The state's final witnesses were James Reginelli, an emergency medical technician with the Shelby County Fire Department, and Laura Fish, a paramedic with Rural Metro Ambulance. They examined the defendant, and they noted that the defendant had been injured, in particular that he was bleeding from his mouth. Mr. Reginelli observed the defendant while he was still in the ditch, and it appeared to Mr. Reginelli that the defendant fell and struck his head.

Both Mr. Reginelli and Ms. Fish smelled an alcohol odor on the defendant. Mr. Reginelli discovered an empty pint bottle of lime gin inside the truck on the passenger's side. Ms. Fish asked the defendant if he had been drinking, and she testified that he responded, yes, and asked her to take it easy on him because he was a former Memphis police officer.

The defendant relied upon the evidence from his previous sentencing hearing, and he introduced a stipulation entered into with the state. The stipulation recited that the defendant was involved in an automobile collision on March 31, 1999, that he was the driver and only occupant of the vehicle, that when he reached the curve in the road, he lost control of the vehicle, and that the vehicle then left the roadway and overturned into a ditch. It was further stipulated that the defendant had not been charged with or indicted with any offense in connection with the accident.

### III. Terms of the Remand

Code section 40-35-401 provides the appellate court with the following options in reviewing and deciding sentencing issues on appeal:

> (c) If a sentence is appealed, the appellate court may:
> (1) Dismiss the appeal;
> (2) Affirm, reduce, vacate or set aside the sentence imposed;
> (3) Remand the case or direct the entry of an appropriate sentence or order; or
> (4) Direct any further proceedings appropriate or required under the circumstances.

Tenn. Code Ann. § 40-35-401(c) (1997). Consistent with this authorization, the court can, for instance, order a reduction in a sentence that would operate independently to achieve the intended result. Alternatively, the court can remand the case and direct that the trial court issue an amended or supplemental sentencing judgment. *See State v. Shannon Lee Beckner*, No. 923, slip op. at 3 (Tenn. Crim. App., Knoxville, Apr. 2, 1991) ("[T]his Court may directly impose a sentence of probation, effective immediately, or it may direct the trial court to impose such a sentence, which would be effective pursuant to the trial court's order."). Consequently, our beginning reference for this appeal is this court's earlier judgment and mandate.

This court's earlier judgment declares in pertinent part,

> This case is remanded to the trial court for entry of an order reflecting that the sentence be served on probation, with the terms and conditions of probation to be set by the trial court.

The court's mandate, which was filed with the trial court on July 12, 1999, directs the trial court in the following fashion:

> Whereas, in our Court of Criminal Appeals, at Jackson, it was adjudged and ordered in the case of James M. Williams . . . appealed to our said Court from said Criminal Court that the same be remanded thereto for further proceedings and final determination.

> These are, therefore, to require you, the Court as aforesaid, that you proceed with the execution of this Judgment of our said Court of Criminal Appeals, by such further proceedings in your Court as shall effectuate the objects of this order to remand, and attain the ends of justice.

The clear language of the court's judgment and mandate commands the trial court to enter an order that the defendant's "sentence be served on probation" and to set the terms and conditions of probation. The remand to the trial court was limited, not general. The state insists that the trial court complied with the limited remand by imposing a sentence of split confinement. We cannot agree.

The first reason why we cannot accept the state's argument is based on the alternative sentencing options enumerated in Code section 40-35-104. Full probation is listed as one option. *See* Tenn. Code Ann. § 40-35-104(c)(3) (1997) ("A sentence of confinement which is suspended upon a term of probation supervision which may include community service or restitution, or both."). A separately listed option is commonly known as "split confinement." *See* Tenn. Code Ann. § 40-35-104(c)(5) (1997) ("A sentence of continuous confinement to be served in a local jail or workhouse in conjunction with a term of probation."). The court's earlier judgment in this case did not remand for imposition of "alternative" sentencing. Had it done so, the trial court would have been authorized to consider split confinement. Instead, the court's judgment directed that the defendant's two-year sentence be served on probation, a specific type of alternative sentencing. If the court had intended an alternative sentence of split confinement, it could and would have so specified. *See, e.g., State v. Louis Lavergne*, No. 01C01-9803-CR-00128, slip op. at 4 (Tenn. Crim. App., Nashville, Jul. 8, 1999) (the manner of service of this sentence is modified to reflect a period of six months confinement in the local jail or workhouse with the remainder of the four year sentence to be served on supervised probation); *State v. Bingham*, 910 S.W.2d 448, 457 (Tenn. Crim. App. 1995), *overruled in part State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

-12-

The second reason why we reject this argument is that the trial court correctly understood that this court's judgment and mandate required full probation. In its written order denying full probation, the trial court wrote, "The Court of Appeals of Tennessee has directed that [the defendant] serve his entire two (2) year sentence on probation subject to terms and conditions to be set by this Court." The trial court, in other words, did not believe that sentencing the defendant to split confinement was the equivalent of ordering the defendant to serve "his entire" two year sentence on probation.

Any lingering doubt about this court's intention that the defendant receive full probation is dispelled by the court's earlier opinion.

> The Defendant is a first offender convicted of a Class E felony. He has no history of criminal conduct. The record suggests no negative factors in the Defendant's background and social history; to the contrary, the record reflects an impressive and solid record as a productive member of society. *He clearly is not an offender for whom incarceration is a priority.* His potential for rehabilitation appears to be excellent. We believe the factors favoring probation clearly outweigh any factors suggesting incarceration.

*James M. Williams*, slip op. at 25 (emphasis added).

Accordingly, we conclude that by imposing a split-confinement sentence the trial court did not thereby fulfill the court's previous judgment and mandate that the defendant serve his two-year sentence on full probation with appropriate terms and conditions.

## IV. Options Consistent with Mandate

The state's next argument, which it advances more forcefully, is that when this court remanded the defendant's case, its status was that of "pending disposition" before the trial court such that additional matters were properly considered. The trial court regarded the situation as "sort of novel" and concluded that it had the authority to make a sentencing decision, different than that ordered by our court, based on changed circumstances. Otherwise, the argument goes, defendants would be immunized for any misconduct occurring during an appeal.

This contention has a certain superficial allure because, as the state correctly notes, our court's jurisdiction is appellate. *See generally* Tenn. Code Ann. § 16-5-108 (1994). We are not authorized to conduct hearings and determine disputed issues of fact. *See Duncan v. Duncan*, 672 S.W.2d 765, 676 (Tenn. 1984). Nonetheless, it does not logically or necessarily follow that during the appellate process a window of opportunity for criminal mayhem, with no accountability or adverse consequences, is thereby opened.

-13-

First, a defendant who remains on bond during the pendency of an appeal cannot indulge in criminal behavior with impunity. The state can file to increase or revoke a defendant's appeal bond. Tennessee Rule of Appellate Procedure 8 provides an effective and efficient mechanism for revising conditions of release and for obtaining appellate review of the conditions. We find no indication in the record before us that the state pursued this option.

Second, nothing prevents the state from initiating separate criminal charges. Provided probable cause exists to believe that a defendant has committed a criminal offense, issuance of a warrant or grand jury indictment can be pursued and obtained. Evidently, this course of action was unavailable in this case. The state advised the trial court that it could not prove that the defendant was under the influence of an intoxicant that impaired his ability to drive at the time of the most recent accident.

Third, Tennessee Rules of Appellate Procedure 14 allows the appellate court to consider post-judgment facts in certain, limited circumstances. In *Duncan v. Duncan*, 672 S.W.2d 765 (Tenn. 1984), the supreme court discussed appropriate guidelines for the scope of Rule 14. One instance suitable for acceptance of post-judgment facts occurs when "'the court is in need of extraneous evidence respecting some situation or fact to enable it to determine, not the propriety of the conduct of the district court, but the nature of the judgment to be directed.'" *Crawford v. Crawford*, 163 Kan. 126, 181 P.2d 526, 531-32 (1947) (quoting *Hess v. Conway*, 93 Kan. 246, 144 P. 205 (1914)), *quoted with approval in Duncan*, 672 S.W.2d at 767-78.

Under facts similar to what happened in this case, the state, for example, could have filed a Rule 14 motion to consider the defendant's post-conviction accident as relevant to the nature of the judgment that should be entered on appeal. That is, rather than a judgment remanding with specific instructions to place the defendant on probation, a judgment remanding the case for further proceedings to determine the type of alternative sentencing could have been sought. Furthermore, pursuant to Rule 14, a limited remand could have been ordered for the purpose of having the trial court hear new evidence regarding the accident; the trial court thereby is assisting the court's appellate jurisdiction. *See Duncan*, 672 S.W.2d at 769.

We are mindful that at the time of the defendant's accident on March 31, 1999, a Rule 11 application for permission to appeal was under consideration by the supreme court. The procedural posture of the case at that time, however, does not affect the options discussed above. Had the supreme court accepted the defendant's appeal, the state could have requested consideration of post-judgment facts by the supreme court. *See* Tenn. R. App. P. 14(a) ("The Supreme Court . . . may consider facts concerning the action that occurred after judgment."). Alternatively, once the supreme court denied permission to appeal, the state could have filed with this court a request that the mandate be stayed or that the mandate be recalled. *See* Tenn. R. App. P. 42(d) (power to stay a mandate includes power to recall a mandate). As grounds, the state could cite to the defendant's accident as appropriate for Rule 14 consideration of post-judgment facts. The state made no such overture in this case.

In many circumstances, the most straightforward course of action would be for the trial court to grant full probation with terms and conditions, after which revocation proceedings could be instituted. *Cf. State v. Shannon Lee Beckner*, No. 923, slip op. at 4-7 (Tenn. Crim. App., Knoxville, April 2, 1991) (affirming probation revocation after remand but allowing that denial of probation after remand could be based on new events). This procedure does not operate to immunize defendants for *criminal* misconduct occurring before probation is ordered because revocation may be predicated upon *criminal offenses* committed before a probationary sentence is imposed. Revocation on this basis depends on knowledge or ignorance of the offenses at the time the suspended sentence is imposed. If the offenses were known before probation was granted, there is a presumption that the prior acts were part of the earlier sentencing equation, and they should not be used for revocation. On the other hand, offenses not disclosed at the time probation is granted may be considered for revocation purposes. *See, e.g., State v. Stubblefield*, 953 S.W.2d 223, 225-26 (Tenn. Crim. App. 1997). No due process notice concerns arise because "the defendant is deemed to have notice that his or her conduct must conform to the requirements of the law from the time of the law's enactment." *Id.* at 225; *see State v. Keel*, 882 S.W.2d 410, 419 (Tenn. Crim. App. 1994) (compliance with state law an automatic condition of probation); *State v. Stone*, 880 S.W.2d 746 (Tenn. Crim. App. 1994).

The defendant in this case was not arrested or charged with any offense in connection with the March 1999 accident. Consequently, reliance on the accident as the basis to revoke probation would have given rise to due process notice concerns. Because the trial court did not "revoke" the defendant's probation, we are not here confronted with or required to settle a constitutional due process dispute. We recognize, however, that at the time of the accident, the defendant was awaiting a decision by the supreme court whether it would grant his Rule 11 application for permission to appeal. The defendant knew that this court had modified his incarcerative sentence to a probationary sentence. He, therefore, was aware and had notice that even if his application for permission to appeal was denied, he would be placed on probation with conditions. Furthermore, the defendant should have been on notice that his privilege to operate a motor vehicle had been subject to revocation since entry of the trial court's judgment of conviction, notwithstanding the appeal of his conviction and sentence. *See State v. Sneed*, 8 S.W.3d 299, 301-02 (Tenn. Crim. App. 1999) (conviction that is on appeal still constitutes final conviction for revocation purposes); *see also* Tenn. Code Ann. §55-50-501(a)(4) (1988) (department shall revoke license upon receiving record of conviction for leaving the scene of an accident involving death, when such conviction is final); Tenn. Code Ann. § 55-10-101(b)(2), (c) (1998) (Class E felony for leaving the scene of an accident involving death; the "commissioner shall revoke the license or permit to drive . . . of the person convicted of a violation of this section").

All of the alternatives that we have discussed so far presuppose either adherence to the court's judgment and mandate or modification/recall of the court's mandate. None of these alternatives were explored in this case, and we express no opinion on the outcome of this case had any or all of them been attempted. We also are not suggesting that these alternatives are exclusive; rather, they belie the argument that defendants are immunized for their misconduct occurring during an appeal.

-15-

It remains for us now to address whether the trial court was authorized to conduct an evidentiary hearing on remand, as was done in this case, and whether the trial court was permitted to disregard or deviate from this court's judgment that the defendant serve his sentence on full probation. The "law of the case" doctrine supplies us with the answers.

## V. "Law of the Case"

The appellate court directs actions and dictates results through its orders, judgments, and mandates. A mandate is controlling as regards matters "within its compass, but on the remand a lower court is free as regards other issues." *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 59 S. Ct. 777 (1939). *See also State v. Irick*, 906 S.W.2d 440, 443 (Tenn. 1995); *Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976)(inferior courts obliged to abide decrees of higher courts; otherwise court system would be "chaotic in its operation and unstable and inconsistent in its decisions").

Fealty to a mandate, however, is not absolute. Although rare, a departure may be justified in exceptional circumstances because adherence to the command of a superior court on remand is a specific application of the "law of the case doctrine." *See* 18 Charles Wright *et al.*, Federal Practice and Procedure § 4478, at 788 (1981) (four distinctive sets of problems are caught up in law of the case terminology; one set arises from the "obligation of every court to honor the rulings of a court that stands higher in a hierarchical judicial structure"). The "law of the case" doctrine is "not a constitutional mandate nor a limitation on the power of a court." *Memphis Publ'g Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). It is a "discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." Id. The doctrine applies to both legal and factual conclusions. *See Carson v. Nashville Bank & Trust Co.*, 204 Tenn. 396, 401, 321 S.W.2d 798, 801 (1959).

Three exceptional circumstances may justify a departure from the "law of the case"; they are: (1) a significant change in controlling legal authority; (2) substantially different evidence offered after remand; and (3) a clearly erroneous prior decision that, if not corrected, will result in a manifest injustice. *Memphis Publ'g Co.*, 975 S.W.2d at 306.

### A. Hearing on Remand

As previously discussed, this court's mandate was limited, not general. The mandate did not contemplate further proceedings, and it did not direct the trial court to undertake additional fact finding or conduct evidentiary hearings. Pursuant to the mandate, the task to be completed on remand was ministerial; it required entering an amended judgment form that sentenced the defendant to full probation and set forth terms and conditions of probation.

Because our mandate was limited, the trial court was not at liberty simply to reopen the defendant's sentencing. Rather, the trial court should have made a threshold determination whether sufficient cause existed to conduct additional hearings. Unless one of the exceptions to the

-16-

"law of the case" doctrine was implicated, no further proceedings were warranted. Moreover, to justify a hearing on one of the exceptions, the moving party must allege grounds sufficiently definite, detailed, and non-conjectural, which if true, would justify a departure from the "law of the case."

Under the particular facts of this case, we do not fault the trial court for conducting an additional hearing after remand. The state led the trial court to reasonably believe that the defendant had committed the offense of driving while intoxicated that caused an automobile accident. That claim, if true, could qualify as "substantially different evidence." At the hearing, however, the state then could not demonstrate that the accident was caused, even partially, by any alcohol that the defendant may have consumed at some earlier time. At best, the state's claim that it advanced to obtain a hearing was a hollow overstatement, but the trial court did not err in its response to the state's representation.

### B. Substantially Different Evidence

The trial court in this case never referred to "law of the case" doctrine. Its intuitive belief that it could consider changed circumstances was, however, accurate. Similar unspoken recognition of exceptions to the "law of the case" doctrine can be found in cases such as *State v. Jeremy A. Winsett*, No. 02C01-9709-CR-00343 (Tenn. Crim. App., Jackson, Sept. 17, 1998), and *State v. Shannon Lee Beckner*, No. 923 (Tenn. Crim. App., Knoxville, April 2, 1991).

In *Winsett*, the defendant's case was reversed and remanded with instructions to grant pre-trial diversion. During the pendency of the appeal, however, the defendant had been arrested and convicted for theft of property. The conviction made him ineligible for pre-trial diversion, and on remand the trial court refused to place the defendant on pretrial diversion. On appeal, our court agreed that the defendant was ineligible and affirmed the judgment of the trial court. *Winsett* is a classic example of the "substantially different evidence" exception to the "law of the case" doctrine.

In *Beckner* the defendant also acquired a new conviction while on bond pending his sentencing appeal from other convictions arising from a home burglary. His sentencing appeal resulted in a remand for the trial court to develop an appropriate Community Corrections Act plan or place the defendant on probation with conditions. After the remand, the defendant also was charged with, but found not guilty of, receiving stolen property.

On remand, the trial court in *Beckner* placed the defendant on intense supervised probation and entered its order to be effective back to the original sentencing date. The trial court then instructed the probation officer to prepare a probation revocation warrant based on the defendant's conduct since the original sentencing date. Following a hearing, the trial court revoked the defendant's probation, and the defendant again appealed.

The court affirmed the revocation of defendant Beckner's probation; in its opinion the court also took the opportunity to discuss the options available to the trial court upon remand from the first appeal. In particular, the court explained that the trial court was not locked into

proceeding by way of probation revocation because the defendant's criminal law violations "would justify either a denial of probation in the first instance or a revocation of a previously imposed probation." *Beckner*, slip op. at 5.

> Although the trial court was obligated to comply with this Court's prior opinion, the defendant cannot be deemed to have been on probation until the trial court had so ordered. Also, until a trial court orders probation, any new event which would legitimately bear on the issue may be brought to the trial court's attention for its consideration. Otherwise, defendants would be immunized for any misconduct occurring during an appeal. Thus, the trial court's belief, in this case, that it must place the defendant on probation because of this Court's opinion would be correct only if nothing of substance has since occurred. When new evidence is brought to the trial court's attention, it should conduct the hearings under the statutes and case law which determine sentencing alternatives, not revocation.

*Id.*, slip op. at 4. This explanation cogently expresses the essence of the "law of the case" doctrine.

In the present case, there was no significant change in controlling legal authority during the time that the defendant's appeal was pending. In addition, this court's prior decision was not clearly erroneous such that manifest injustice is the result. The only possible exception to the "law of the case doctrine" into which the defendant's case could fall is the exception for substantially different evidence.

The "substantially different evidence" exception, as the phrase indicates, is fact specific. The evidence at issue should, at a minimum, be relevant and of consequence to the terms of the remand. Cumulative evidence, without more, is insufficient to depart from the law of the case. The evidence must be not only "different" but "substantially different" to upset the orders and rulings of a higher court. In our opinion, the exception does not apply in this case.

This court modified the defendant's original incarcerative sentence based on a *de novo* review of the record without a presumption of correctness, because the trial court did not affirmatively demonstrate that it had considered the relevant sentencing principles. This court, as part of its *de novo* review, articulated and took into account the following factors: whether probation will subserve the ends of justice and the best interest of both the public and the defendant; the potential or lack of potential for the rehabilitation or treatment of the defendant; whether the nature of the offense outweighs all factors favoring probation; whether confinement is necessary to avoid depreciating the seriousness of the offense; and whether the denial of probation will prevent crime and promote respect for the law by providing an effective general deterrent to those likely to violate the law. *See James M. Williams*, slip op. at 23-24.

Applying these factors to the facts, this court explained why probation was appropriate. First, "[t]he Defendant is a first offender convicted of a Class E felony." *Id.*, slip op. at 25. The March 1999 accident does not affect that fact. The defendant was not arrested or charged with any criminal offense in connection with the accident.

Second, the defendant "has no history of criminal conduct." *Id.* The March 1999 accident does not affect that fact.

Third, the "record suggests no negative factors in the Defendant's background and social history." *Id.* The defendant's background and social history were detailed in the presentence investigation report prepared for the trial court in connection with the defendant's original sentencing. Nothing in that history persuaded this court that the defendant should not receive probation, and the March 1999 accident does not rise to the level of "substantially different evidence."

Fourth, "the record reflects an impressive and solid record as a productive member of society." *Id.* The March 1999 accident does not detract from the defendant's record. It has no bearing on his employment reliability or work ethic.

Fifth, the defendant "clearly is not an offender for whom incarceration is a priority." *Id.* The March 1999 accident does not change that evaluation. Code section 40-35-102(5) provides that incarceration is a priority for "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation." Tenn. Code Ann. § 40-35-102(5) (1997). The defendant is "clearly" not such an offender.

Last, the defendant's "potential for rehabilitation appears to be excellent." *James M. Williams*, slip op. at 25. Various considerations enter into potential for rehabilitation, such as credibility, remorse, candor, and work history. *See, e.g., State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); *State v. Anderson*, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992). The March 1999 accident does not implicate these kinds of concerns. Moreover, the defendant already has voluntarily sought out and obtained inpatient treatment for major depression, post-traumatic stress disorder, alcohol dependence and hypertension. Rigorous conditions of probation can effectively deal with any alcohol dependency concerns.

For the foregoing reasons, we are of the opinion that the March 1999 accident was not such substantially different evidence as would have authorized the trial court to depart from the law of the case as settled in this court's earlier opinion. Consequently, we reverse the split-confinement sentence that the trial court imposed on remand.

Before leaving this "law of the case" issue, a final observation is in order. Our review of the evidence from the "law of the case" perspective is fundamentally different than appellate review when there is a challenge to the length, range, or manner of service of a sentence.

In the latter situation, the court conducts a *de novo* review of the record with a presumption that the determinations made by the trial court are correct, provided that there is an "affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see* Tenn. Code Ann. § 40-35-401(d) (1997). If appellate review reflects that the trial court properly considered all relevant factors and that its findings of fact are adequately supported by the record, this court must affirm the sentence, even if our independent judgment on the question might differ. *See State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Pursuant to this standard of review, if the trial court had been able to consider the March 1999 accident as part of its original sentencing determination and if the trial court had properly considered the sentencing principles and all relevant facts and circumstances, its decision to impose split-confinement likely would not have been disturbed even if this court disagreed. By contrast, the trial court's decision to order a hearing and to deviate from our judgment is subject to more sweeping review. Broader review is required because the court is dealing, in the first instance, with the legal sufficiency of claims made by the moving party who is seeking a hearing to establish an exception to the "law of the case" doctrine. Broader review is also required to determine if the evidence is legally sufficient to make out an exception to the "law of the case" doctrine. In this case, the evidence is not legally sufficient.

The defendant has raised two other sentencing issues on appeal. Our ruling pretermits consideration of these issues, and we do not reach their merits.

## VI. Conclusion

For the foregoing reasons, we reverse the defendant's sentence. Pursuant to Code section 40-35-401(c), the judgment of conviction is amended and modified as follows: The defendant is hereby sentenced to a term of two years, all of which is suspended, and the defendant is placed on supervised probation for the term of his sentence. The defendant shall be subject to usual and customary rules for supervised probationers, including satisfying any reporting and administrative requirements. In addition, the defendant is ordered to perform 80 hours of community service, to refrain from possessing a firearm or other dangerous weapon, to notify promptly his probation officer of any arrest or citation and of any change in his address or employment, to abstain from the consumption of alcoholic beverages and from the consumption of any nonprescription narcotic substances, and to submit to random drug/alcohol testing. *See* Tenn. Code Ann. § 40-35-303(d) (1997).

_____
JAMES CURWOOD WITT, JR., JUDGE