IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2009

**STATE OF TENNESSEE v. JOHNNY L. SAPP**

**Direct Appeal from the Circuit Court for Bledsoe County**
**No. 29-2006    J. Curtis Smith, Judge**

_____

**No. E2008-00663-CCA-R3-CD - Filed March 31, 2010**

_____

The appellant, Johnny L. Sapp, was found guilty of one count of possession of a motor vehicle from which the serial number has been removed in violation of Tennessee Code Annotated section 55-5-111 and two counts of altering the serial number on a motor vehicle in violation of Tennessee Code Annotated section 55-5-112. He received a total effective sentence of two years. On appeal, the appellant argues that the evidence was insufficient to support his convictions; that his convictions for possession of a motor vehicle from which the serial number had been removed and altering the serial number on a motor vehicle violate double jeopardy; and that the trial court erred in denying judicial diversion or probation. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Johnny L. Sapp.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James William Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In March 2006, the Bledsoe County Grand Jury returned a multi-count indictment against the appellant, charging him with theft of property valued over $60,000; possessing a Kubota tractor from which the serial number was removed; possessing a 1992 Ford F250 truck from which the serial number was removed; destroying or altering a serial number on a Kubota tractor; destroying or altering a serial number on a 1992 Ford F250 truck; destroying or altering a serial number on a 1997 Ford F350 truck; possessing a Woods front-end loader from which the serial number was altered, covered, defaced, destroyed, or removed; possessing a Sundowner horse trailer from which the serial number was altered, covered, defaced, destroyed, or removed; removing the serial number from a Woods front-end loader; and removing the serial number from a Sundowner horse trailer.

At trial, William Henry Shugart testified that he was a cattle farmer from Cohutta, Georgia. Shugart said that on December 14, 2002, his Kubota tractor with a Woods front-end loader, which together were valued at $40,900, were stolen from him while he was at church. Later, police found the tractor and front-end loader and returned the items to Shugart. A vehicle identification number (VIN) plate was missing from the loader and was replaced by an American flag sticker. Additionally, a sticker which reflected that the tractor was an M9000 model had been placed over a sticker which had the correct model number M8200.

Charles Kent testified that he owned a small tractor business in Calhoun, Georgia. He said that he owned a 1997 Ford F350 truck valued at $20,000 and that he kept the truck inside a fence at the business. In 2001, the truck was stolen. He said that the truck had all its proper VIN stickers in place. Kent said that the loss of the truck was devastating to his family business. The truck was eventually recovered by police.

Lynn Evans, a deputy sheriff who lived in Hillsboro, Ohio, testified that he owned an EBY stock trailer valued at approximately $10,000 to $11,000. On December 22, 2001, the trailer was stolen from his farm in Highland County, Ohio. Evans said he eventually got his trailer back, and the trailer still had its VIN stickers in place.

Linda Simmons testified that she lived in Ringold, Georgia, and that in March 2002, her Sundowner horse trailer valued at $15,000 to $16,000 disappeared from her property. She said the trailer had been a "special order." She did not get her trailer back but was compensated by her insurance company.

John Lamb testified that he lived in Dalton, Georgia. Lamb and the appellant worked for CSX Railroad, and the appellant had previously done some "backhoe work" at Lamb's house. Lamb said that in 1993 or 1994, he bought a used all terrain vehicle (ATV) for

$3,000 and kept it in a building on the side of his house. In September 1995, the ATV was stolen. Later, the ATV was located in Bradley County, Tennessee, and was returned to him.

Jeff Stiles, a criminal investigator with the Tennessee Highway Patrol, testified that on May 7, 2005, he went to the appellant's residence after receiving information about a stolen M8200 Kubota tractor with a Woods front-end loader. Investigator Stiles said:

> The house that we went to, I don't remember exactly who the owner was, it wasn't [the appellant], it was just a small parcel of ground in front of [the appellant's] property that there was a trailer on that [the appellant] was residing in, along with family. The farm was actually in the name of [the appellant].

Investigator Stiles said that the appellant's property was a "working farm" and that the trailers and equipment at the residence appeared to have been used. Investigator Stiles asked the appellant if he could look at the Kubota tractor the appellant had, and the appellant gave his permission. Investigator Stiles said he saw a sticker identifying the tractor as an M9000 and thought he had the wrong tractor. He looked for a serial number on the Woods front-end loader, but it was missing; the area where the serial number plate should have been was "clean," appearing as if a plate had never been there. Additionally, there was no VIN on the Kubota tractor. However, Investigator Stiles was able to identify the tractor as Shugart's by using a "confidential number" which had been placed on the vehicle by the manufacturer. The appellant told Investigator Stiles that he bought the Kubota tractor in September or October 2004 from a man who lived in Rome, Georgia, and whose surname was Russell. He said he paid cash and had no documentary proof of ownership for the Kubota tractor.

With the appellant's permission, Investigator Stiles looked at the appellant's other vehicles and equipment. Investigator Stiles examined a black Ford truck which the appellant said was a 1992 model. Several envelopes blocked Investigator Stiles' view of the VIN plate on the dashboard. Investigator Stiles told the appellant that he could not see the VIN plate, and the appellant directed Investigator Stiles' attention to the VIN sticker on the door jamb of the truck. Investigator Stiles said that a VIN sticker applied by a manufacturer is smoothly adhered; however, the VIN sticker on the door jamb was "peeling off," had red paint on the back, and read "VOID," an indication that it had been peeled off of another vehicle. Investigator Stiles explained:

> The [VIN] plates are usually adhesive type plates, like glued or riveted on, and the reason they do that is where you can't remove them and make them difficult to remove. The only way to remove these, you drill the rivets out and you can remove

it, that scratches up the plate and makes it noticeable, or when you peel the adhesive tape off, they're made to self-destruct where you can't peel them off. They're made to either tear apart or leave some type of imprint, the adhesive on there that had the wording . . . void or something like that. Usually they say void on them after you peel them off to where you can know that they've been removed.

. . . .

I've worked auto theft a lot . . . and worked a lot of chop shops and things like that, and what people do, I've seen them where they have torn [VIN stickers] off and didn't know that they had to do that, but what most of them do, they have a paint remover. It looks kind of similar to a hair dryer, and heats paint up, or you can get a hair dryer that will mostly heat those up until the glue softens enough to where you can pull it off.

Investigator Stiles performed a computer search of the VIN sticker on the door jamb and discovered that the VIN was registered to a 1992 Ford F250 truck. The black truck's license plate was also registered to a 1992 Ford F250 truck. However, the black truck's seat belt indicated that it was made in 1996, the owner's manual in the glove box was for a 1997 Ford F350, and the VIN plate on the dash under the envelopes was registered to a 1997 Ford F350 which had been reported stolen. Investigator Stiles stated that a VIN sticker should have been in the glove box of the 1997 Ford F350, but the sticker was missing. The appellant told Investigator Stiles that he found the black 1997 Ford F350 truck in a "trader magazine" and paid a man in East Alabama cash for it. However, he was unable to produce documentary proof of ownership.

On the appellant's property, Investigator Stiles found the white 1992 Ford F250 to which the VIN and the license plate on the black truck were registered. The appellant had insurance coverage only on the 1992 truck. There was no VIN on the door jamb of the 1992 Ford F250. Investigator Stiles recalled that although the 1992 Ford F250 was white, the door jamb was red. The VIN on the dash of the 1992 truck matched the VIN on the door jamb of the 1997 truck. Investigator Stiles said he did not try to start the 1992 truck because the battery was dead, and, due to the debris on the truck, he opined that the truck had not been driven in quite a while.

Investigator Stiles also discovered an EBY trailer on the appellant's property. The VIN plate on the trailer was intact, but the trailer had been reported stolen. The appellant

told Investigator Stiles that Arnold DeBoard gave him the trailer as payment for money he owed the appellant for the purchase of some cows. Additionally, Investigator Stiles found a Sundowner horse trailer which had been reported stolen. The appellant said that he bought the Sundowner horse trailer from a man at a horse sale in Cookeville. The VIN sticker was missing from the dash of the horse trailer. Investigator Stiles also found on the appellant's property an ATV which had been reported stolen. The appellant told Investigator Stiles that he found the ATV in a trader magazine and arranged to meet the man who owned it at a McDonald's parking lot in Calhoun, Georgia. Investigator Stiles testified that the appellant did not have a title or any documentary proof of ownership for the trailer and the ATV.

Investigator Stiles also found a Hudson trailer on the appellant's property. The trailer had been stolen from CSX Railroad after the railroad leased it from a rental company. The appellant told Investigator Stiles that a "signal boy" with the railroad gave him permission to take the trailer.

Investigator Stiles said that none of the items on the appellant's farm were concealed or hidden. However, he said that "they weren't easily visible from the road either."

Tim Duncan, a "special agent with the CSX Railroad Police Department," testified that Investigator Stiles invited him to be present when a search warrant was executed at the appellant's residence. While there, Duncan found numerous items belonging to CSX, including fifteen cases of oil, track carts, toolboxes, portable derailers, radios, paper towels, safety glasses, earplugs, and manual and electric hand tools. Duncan said that he saw more CSX property at the appellant's residence than he had seen at any CSX equipment depot. Duncan said that, as an employee, the appellant was not permitted to stockpile equipment and that no one was allowed to use CSX property for personal use unless CSX had no further use for the property.

The appellant testified that he was married, had three children, and worked for CSX for thirty-one years. He said that he was the foreman of a "super cat crew" which performed maintenance on the railroad track. The appellant explained that he was often "on the road" for work and that his office was at his home. He said that as foreman, he was required to supply his crew; therefore, supplies were routinely shipped to his home. He said that all of the CSX equipment at his home was for his job, not for his personal use, because "there was no other use for" the equipment.

The appellant said his home was on a working farm. He said that "over the years," he had bought and sold a number of used vehicles and equipment. He explained that he "like[d] to trade" and that he often bought trader magazines or went to auctions to find equipment. He said that his trades and purchases were typically done in cash to make

transactions easier. He also said that unless he specifically asked, he did not receive receipts for his transactions.

The appellant said that on the day Investigator Stiles came to his home, he was in the process of rebuilding it after a fire. He maintained that he was given permission to use the Hudson trailer to haul building materials for his home project and that he planned to return the trailer to CSX but had not had time.

The appellant said that he found an advertisement in a trader magazine for a 9000 model Kubota tractor with a Woods front-end loader. The appellant paid a man named Russell $20,000 cash for the tractor. He said that stickers on the trailer reflected that the trailer was a 9000 model and that he did not know the tractor was an 8200 model. The appellant said that he did not check the tractor for a VIN when he bought it. He denied removing a VIN from the tractor or the front-end loader. The appellant said that he did not keep any equipment concealed or hidden on his farm.

The appellant said that in late 2003 or early 2004, he had trouble with his 1992 Ford F250 truck, so he bought a black 1997 Ford F350 truck that he found in a trader magazine. The man who sold it to him told the appellant that the F350 had been wrecked and rebuilt and that it would take some time to get a "rebuilder's title."[1] The appellant agreed to give the man $3,500 upon delivery of the truck and $4,000 upon the delivery of the title. When the man delivered the F350, the man removed the dealer's license plate he had on the truck. The appellant told him that he needed to be able to drive the F350 immediately, so the man took the license plate from the appellant's F250 and placed it on the F350. The appellant said the man also removed a VIN sticker from the F250 and placed it on the door jamb of the F350. The man then told the appellant, "Now then you can drive it." The appellant denied directing Investigator Stiles' attention to the VIN sticker on the door of the F250, hiding the VIN plate on the dashboard with envelopes, or telling Investigator Stiles that the truck was a 1992 model. The appellant said that when Investigator Stiles came to his house, he was still waiting for the title to the F350.

The appellant said that he had had the EBY trailer for three or four years, explaining that Arnold Deboard gave him the trailer as payment for cattle Deboard bought from the appellant. The appellant said he had owned the Sundowner horse trailer for "a little over a year," and he had paid $2,500 for it. The appellant said that he had owned the ATV for a couple of years. He said he found the ATV in a trading magazine and paid a man $500 cash for it.

---

[1] The appellant did not disclose the name of the man who sold him the 1997 truck.

At the conclusion of the trial, the jury found the appellant guilty of possessing the 1992 Ford F250 from which the serial number has been removed, altering the serial number on the 1992 Ford F250, and altering the serial number on the 1997 Ford F350. The jury was unable to reach a verdict on the theft offense, and a mistrial was declared. The appellant was acquitted of the remaining offenses.

## II. Analysis

On appeal, the appellant argues that evidence is insufficient to support his convictions and that his convictions for possessing the 1992 Ford F250 from which the serial number has been removed and for altering the serial number on the 1992 Ford F250 violate double jeopardy. Additionally, he argues that the trial court erred in denying judicial diversion and in denying full probation.

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Count three of the indictment charged the appellant with possessing a 1992 Ford F250 from which the VIN had been removed in violation of Tennessee Code Annotated section 55-5-111. Tennessee Code Annotated section 55-5-111 provides:

> Any person who knowingly buys, receives, disposes of, sells, offers for sale, or has in that person's possession any motor vehicle, engine or transmission removed from a motor vehicle, from which the manufacturer's serial, engine or transmission number or other distinguishing number or identification mark or number placed thereon under assignment from the division has

been removed, defaced, covered, altered or destroyed commits
a Class A misdemeanor.

The appellant concedes that a VIN sticker had been removed from the door of the 1992 Ford F250. However, he contends that because VIN stickers or plates were on the truck in other locations, the evidence was therefore insufficient to sustain his conviction. We disagree. The statute the appellant violated appears in the Code under the chapter entitled "Anti-Theft Provisions." It stands to reason that the purpose of the statute is to prevent the alteration of identifying marks to mislead others about the identity of a vehicle, which is exactly what the appellant did in this case. The appellant is not entitled to relief on this issue.

Count five charged the appellant with unlawfully, knowingly, and fraudulently destroying or altering the VIN on the 1992 Ford F250 in violation of Tennessee Code Annotated section 55-5-112. Count six charged the appellant with unlawfully, knowingly, and fraudulently destroying or altering the VIN on the 1997 Ford F350 in violation of Tennessee Code Annotated section 55-5-112. Tennessee Code Annotated section 55-5-112(a) provides:

> No person shall with fraudulent intent deface, destroy or alter the manufacturer's serial, engine or transmission number or other distinguishing number or identification mark of a motor vehicle or its component parts, nor shall any person place or stamp any serial, engine, transmission or other number or mark upon a motor vehicle or its component parts, except one assigned by the department. A violation of this subsection (a) is a Class E felony.

The appellant argues that although the proof established that an identification sticker was moved from the 1992 Ford F250 to the 1997 Ford F350, "[t]he record does not contain any evidence that identification numbers on the vehicle[s] . . . were altered, defaced or destroyed."

The proof adduced at trial demonstrates that the appellant with fraudulent intent altered the VIN of the 1992 Ford F250 and the 1997 Ford F350. First, the appellant defaced and altered the VIN sticker on the 1992 Ford F250 by removing it from the door jamb. The appellant then placed that VIN sticker on the door jamb of the 1997 Ford F350 so that the 1997 truck appeared to be the 1992 Ford F250 for which the appellant had proper registration and insurance. In sum, both vehicles had an altered VIN. Further, according to Investigator Stiles, the appellant directed Investigator Stiles' attention to the altered VIN sticker after the investigator informed the appellant that he could not see the VIN plate on the dash, which

would have revealed that the truck was a stolen 1997 Ford F350. Additionally, the VIN stickers were missing from the glove box of both the 1992 and 1997 trucks, and an EPA sticker on the engine of the 1997 truck read "void," indicating the sticker had been peeled off. The appellant acknowledged that the 1992 truck's VIN sticker was placed on the 1997 truck so he could drive it with the license plate that was registered to the 1992 truck. The appellant maintained that someone else moved the VIN sticker, a claim the jury obviously discredited. Accordingly, we conclude that the evidence is sufficient to uphold the appellant's convictions.

## B. Double Jeopardy

The appellant next contends that his conviction for possessing the 1992 Ford F250 truck from which the serial number had been removed or altered and his conviction for altering the serial number on the 1992 Ford F250 truck violate the principles of double jeopardy. The double jeopardy clauses of the United States and Tennessee constitutions protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). The instant case involves the third category. In Tennessee, whether two offenses are the "same" for double jeopardy purposes depends upon a close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances. See State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975). This analysis is guided in part by the application of the test announced in Blockburger:

> "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."

Black, 524 S.W.2d at 919 (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). In order to determine if double jeopardy attaches, our supreme court devised a four-part test:

> (1) a Blockburger analysis of the statutory offenses;
>
> (2) an analysis, guided by the principles of [Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973)], of the evidence used to prove the offenses;

(3) a consideration of whether there were multiple victims or discrete acts; and

(4) a comparison of the purposes of the respective statutes.

Denton, 938 S.W.2d at 381. However, "if the offenses are the 'same' under Blockburger, the federal constitutional double jeopardy protections have been violated and the inquiry may end." State v. Hayes, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999).

As we stated earlier, Tennessee Code Annotated section 55-5-111 is aimed at punishing the knowing buying, receiving, disposing of, selling, offering for sale, or possessing a motor vehicle from which the identifying mark has been removed, in other words, this "Anti-Theft Provision[]" seeks to punish those who buy, sell, receive, or possess motor vehicles upon which the identifying mark has been removed. Tennessee Code Annotated section 55-5-112(a) punishes someone who, with fraudulent intent, causes the defacement, destruction, or alteration of the identifying mark(s) of a motor vehicle; in other words, this statute is aimed at the person who actually defaces, alters, or destroys the identifying marks. We conclude that the statutes in question prohibit different acts, require different mental states, and contain different elements. Therefore, we conclude that the appellant's convictions do not violate the principles of double jeopardy.

## C. Judicial Diversion

Next, the appellant contends that the trial court erred in denying him judicial diversion. A defendant is eligible for judicial diversion when he or she is found guilty of a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B)(i) (2006). It is within the trial court's discretion to grant or deny judicial diversion. See State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Accordingly, the trial court's decision will be overturned only if the court abused its discretion. Id. In other words, we will not interfere with the denial of judicial diversion if the record contains any substantial evidence to support the trial court's refusal to grant diversion. Id. Moreover, we observe that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under [Tennessee Code Annotated section] 40-15-105." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social

history, (5) the status of the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). "The trial court should also consider whether judicial diversion will serve the ends of justice – the interests of the public as well as the accused." Id. The record must reflect that the trial court has taken all of the factors into consideration. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

The trial court noted that the appellant's "lack of criminal history, work history, present condition, marital and family responsibility, and behavior since arrest" favored judicial diversion. However, the trial court observed that the appellant's "lack of candor in this case was staggering." The court said:

> Based on [the appellant's] long history of buying, selling, and trading, and based on his general work experience, [he] certainly knew that the stolen items found in his possession required proof of ownership, yet he had not a single document on any of the stolen items. This court heavily weighs in this analysis [the appellant's] glaring lack of truthfulness which extends to events that occurred over an extended period of time.

"Lack of candor and credibility are indications of a defendant's potential for rehabilitation." State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). Generally, a trial court is in the best position to assess the credibility of a defendant and his potential for rehabilitation. Id. The appellant's lack of credibility weighs against his amenability to correction. See Anderson, 857 S.W.2d at 574. Additionally, the nature and circumstances of an offense alone may support a denial of judicial diversion. State v. Kyte, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993). The trial court determined that the appellant was involved in criminal behavior that "occurred over an extended period of time." The commission of offenses in separate actions over a period of time indicates a sustained intent to violate the law on the part of the appellant. Therefore, we conclude that the trial court did not err in denying judicial diversion.

## D. Full Probation

The appellant's final issue is whether the trial court erred in denying probation. Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2006). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct

involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant was convicted of one count of possession of a motor vehicle from which the serial number has been removed, a Class A misdemeanor, and two counts of altering the serial number on a motor vehicle, a Class E felony. At the conclusion of the sentencing hearing, the trial court sentenced the appellant, as a standard, Range I offender, to eleven months and twenty-nine days for the Class A misdemeanor conviction, one year for the Class E felony conviction relating to the 1992 truck, and two years for the Class E felony conviction relating to the 1997 truck, with the sentences to be served concurrently for a total effective sentence of two years. The trial court found that "an individual with [the appellant's] character for untruthfulness [should] serve a term of incarceration." Therefore, the court ordered the appellant to serve eleven months and twenty-nine days in the Bledsoe County Jail for the Class A misdemeanor conviction, three months and eighteen days for the Class E felony relating to the 1992 Ford F250 truck, and seven months and nine days for the Class E felony relating to the 1997 Ford F350 truck. In sum, the appellant was ordered to serve eleven months and twenty-nine days of his effective two-year sentence.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a) (2006). The appellant's sentences meet this requirement. Additionally, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6).[2] Moreover, as set forth in Tennessee Code Annotated section 40-35-103(1), sentences involving confinement should be based on the following considerations:

---

[2] The appellant contends that he "is presumed to be a favorable candidate for alternative sentencing." However, as of June 7, 2005, Tennessee Code Annotated section 40-35-102(6) provides that certain offenders "should be considered" favorable candidates for alternative sentencing instead of being presumed favorable candidates for alternative sentencing. See State v. Carter, 254 S.W.3d 335, 346-47 (Tenn. 2005).

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

In the instant case, the trial court imposed a sentence of split confinement, which is an alternative sentence. See Tenn. Code Ann. § 40-35-306(a) (2006); State v. Williams, 52 S.W.3d 109, 120 (Tenn. Crim. App. 2001). However, "[t]he determination of whether the appellant is entitled to an alternative sentence and whether the appellant is entitled to full probation are different inquiries." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Therefore, an appellant seeking full probation bears the burden of establishing his suitability for full probation. Id.; see also Tenn. Code Ann. § 40-35-303(b) (2006). To prove his suitability, the appellant must establish that granting full probation will "subserve the ends of justice and the best interest of both the public and the [appellant]." State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (internal quotation marks and citation omitted), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000). Moreover,

[i]n determining one's suitability for full probation, the court may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes.

Boggs, 932 S.W.2d at 477.

As we observed earlier, an appellant's lack of candor and his credibility are indicators of his potential for rehabilitation, and the trial court is best positioned to assess credibility and rehabilitative potential. <u>Nunley</u>, 22 S.W.3d at 289. The trial court found the appellant had a "staggering" lack of candor which weighed against his amenability to correction and demonstrated the need to serve a period of confinement. The record does not preponderate against the trial court's finding. Accordingly, we conclude that the trial court did not err in denying full probation.

### III.  Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE