# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 20, 2012 Session

## STATE OF TENNESSEE v. GLOVER P. SMITH

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-63667        Don R. Ash, Judge**

---

**No. M2011-00440-CCA-R3-CD - Filed July 6, 2012**

---

A Rutherford County Circuit Court Jury convicted the appellant, Glover P. Smith, of fabricating evidence in counts 1 and 2 and filing a false report in counts 3 through 8. During a sentencing hearing, the trial court merged the appellant's convictions of filing a false report in counts 3, 4, and 5 and ordered that he serve an effective sentence of one year in jail followed by six years of probation. Subsequently, the trial court granted the appellant's motion for judgment of acquittal as to the fabricating evidence convictions based upon insufficient evidence. On appeal, the State contends that the trial court erred by granting the appellant's motion for judgment of acquittal. In a counter-appeal, the appellant maintains that the evidence is insufficient to support the convictions; that the trial court improperly instructed the jury on "knowingly"; that newly discovered evidence warrants a new trial; that the State committed a <u>Brady</u> violation; that his multiple convictions in counts 3, 4, and 5 and in counts 6, 7, and 8 violate double jeopardy; that the trial court improperly enhanced his sentences and improperly denied his request for full probation; and that the cumulative effect of the errors warrants a new trial. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by granting the appellant's motion for judgment of acquittal and reinstate his convictions of fabricating evidence in counts 1 and 2, the merger of the convictions, and the sentence. We also conclude that the trial court should have dismissed the charges of filing a false report in counts 4 and 5 because they were mutliplicitous with the charge in count 3. The appellant's remaining convictions and sentences for filing a false report in counts 6, 7, and 8 are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part and Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Mary J. Clement (on appeal), Portland, Tennessee, and John H. Norton, III, and Liberti A. Snider (at trial), Shelbyville, Tennessee, for the appellant, Glover P. Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Trevor Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In March 2009, the Rutherford County Grand Jury indicted the appellant for one count of fabricating evidence and four counts of initiating or making a false report. In October 2009, the grand jury returned a superseding indictment, charging the appellant with two counts of fabricating evidence and six counts of initiating or making a false report. The charges related to the disappearance of the appellant's then sixty-nine-year-old wife, Marsilene Smith.

John Flynt testified that in December 2007, he was a dispatcher for the Murfreesboro Police Department (MPD). At 6:00 p.m. on December 6, 2007, the appellant telephoned the police department and reported his wife missing. Flynt broadcasted information about the appellant's wife and her vehicle to patrol officers, and Officer Bobby Edwards was dispatched to the appellant's home.

The State played the appellant's recorded call with Flynt for the jury. During the call, the appellant told Flynt that his wife went shopping about 1:30 or 2:00 p.m., that "she never goes off this long," and that she was a diabetic and needed to eat. The appellant also said that his wife had a cellular telephone, that he tried to call her twice, but she did not answer. The appellant reported that his wife was driving a 2000 Lincoln Navigator and that the vehicle was a champagne color. He thought his wife may have gone to Walmart to buy Christmas decorations. Flynt put the appellant on hold and called the local hospital to find out if Marsilene Smith had been admitted to the emergency room (ER). A hospital employee told Flynt that Mrs. Smith had not been in the ER that day. When Flynt resumed speaking with the appellant, the appellant said he did not want to leave the house to look for his wife in case she tried to call him at their home.

On cross-examination, Flynt acknowledged that the appellant told him that Mrs. Smith needed insulin. Given Mrs. Smith's medical condition, Flynt considered the appellant's call to be an emergency.

-2-

Officer Bobby Edwards of the MPD testified that he was dispatched to the appellant's home on December 6, 2007, and arrived at 6:14 p.m. The appellant told him that Mrs. Smith left home at 1:30 p.m. to go shopping, that she was diabetic, and that she was usually home before dark. The appellant said his wife was driving a champagne-colored Lincoln Navigator, and he gave the vehicle's license tag number to the officer. Officer Edwards put out a BOLO, a "be-on the-lookout," for Marsilene Smith and filed a report, which the appellant read and signed. The appellant told Officer Edwards that Mrs. Smith had about six hundred dollars with her, but the officer did not include that information in the report. The appellant also told the officer that Mrs. Smith may have gone to the Walmart on Rutherford Boulevard. Officer Edwards contacted Officer Dave Norton and asked him to look in the Walmart parking lot for Mrs. Smith's Navigator. A short time later, Officer Norton informed Officer Edwards that he did not find the vehicle.

On cross-examination, Officer Edwards acknowledged that he created a "supplemental report" and that the supplement contained information not included in his original report. Officer Edwards created the supplement in 2009, about two years after Mrs. Smith's disappearance, and the appellant did not review the supplement.

Ethan Highers testified that in December 2007, he was an asset protection associate for Walmart Store 5057 in Murfreesboro. His duties included patrolling the premises and maintaining the store's closed circuit television cameras. On December 7, 2007, the MPD contacted the store and requested video footage. Highers began reviewing recorded video of the parking lot and gave the pertinent footage to the police department. Specifically, video footage recorded at 2:24:54 p.m. on December 6, 2007, was relevant to the police department's investigation into Marsilene Smith's disappearance.

On cross-examination, Highers testified that he provided the police department with twenty-four to thirty-six hours of video. He described the video footage as "choppy."

Leah Talbert testified that one day in December 2007, she and her fiancé went to the Walmart on Rutherford Boulevard. Talbert's fiancé was driving Talbert's car, and Talbert was sitting in the front passenger seat. While they were looking for a parking space, Talbert's fiancé almost hit a white sport utility vehicle (SUV). Talbert's fiancé drove around the SUV, and Talbert made eye contact with its driver. She said that the driver was a man "probably in his 60's or so," that he had an oval face, and that he was wearing large-framed glasses. She also said that the driver's chin "kind of came out from his face a little bit" and that "[h]e looked well put together." Talbert's fiancé parked her car, and they went into Walmart. Later, Talbert spoke with Detective Michael Taylor and viewed a photograph array. She selected the appellant's photograph from the array and identified him as the driver of the SUV. She also identified the appellant at trial as the driver. Talbert said that she had

not seen the appellant prior to their encounter in the parking lot and that she had not seen him on the television news prior to selecting his photograph.

On cross-examination, Talbert testified that she gave a written statement to police. She acknowledged that in her statement, she said the driver was probably in his "'60's, late 50's, or something like that.'" She also acknowledged that she said that the driver was "skinny" and that she was "50 percent sure" a passenger was not in the SUV with him. She acknowledged that she told Detective Taylor that the driver had gray hair, parted to the side, and that he was wearing "sort of big" glasses. He was not wearing a hat. She acknowledged that she saw the driver for a very short period of time and that she had reviewed the video footage of the Walmart parking lot before the appellant's trial.

Captain Chris Guthrie of the MPD testified that on the morning of December 7, 2007, he learned about Marsilene Smith's disappearance and that her Navigator had been found at the Walmart on Rutherford Boulevard. Captain Guthrie went to the scene and saw the Navigator parked between two Budget rental trucks. He looked inside the SUV and saw a purse on the front seat and a makeup bag in the center console area. Captain Guthrie had the SUV towed to the police department for processing.

Captain Guthrie testified that on the afternoon of December 7, he and Major James Gage went to the appellant's home to talk with him about Mrs. Smith's disappearance. The appellant came outside and told them that his neighbors were visiting and that he did not have time to speak with the officers. Captain Guthrie stated that as he and Major Gage were leaving, the appellant "got kind of irate" and said, "'Have you found my wife yet?'" Captain Guthrie told the appellant that they would return later to speak with him. Later that afternoon, the officers returned to the appellant's home. The appellant told them that his wife left to go shopping about 1:30 p.m. and that she had three to five hundred dollars with her. Captain Guthrie asked to look inside the appellant's garage, and the appellant consented. Captain Guthrie said he noticed a "greenish-looking, teal colored" bicycle. He said that the bicycle was a "'beachcomber bicycle'" and that it reminded him of an "old-time bicycle." He said the appellant told them, "'I understand I'll probably be a suspect in this.'"

Captain Guthrie testified that on the morning of December 8, he and other officers watched the video footage of the Walmart parking lot. He said the video showed that Mrs. Smith's SUV almost collided with another car, that the SUV pulled into a parking space, and that "somebody [got] out on a bicycle." He said that the bicycle was the same type as the one in the appellant's garage, that the person riding the bicycle appeared to be "an older person," and that the appellant "came to mind." The appellant arrived at the police department for an interview. Captain Guthrie showed him the video footage and asked if he recognized the person on the bicycle. The appellant said he did not. Major Gage interviewed the appellant

-4-

and obtained consent to search his home. During the search, Captain Guthrie noticed the appellant's home was immaculate and collected the bicycle from the garage. Captain Guthrie also collected from the master bedroom closet some dark colored baseball caps and a tan jacket, clothing similar to that worn by the person on the bicycle. The State played the Walmart video footage for the jury and brought a bicycle into the courtroom. Captain Guthrie identified the bicycle as the one he collected from the appellant's garage.

On cross-examination, Captain Guthrie testified that Mrs. Smith's SUV was unlocked and that the keys were in the ignition. He acknowledged that her wallet and a small leopard-print bag in which she usually kept her cash were never located. No blood or fingerprints were found in the SUV. Regarding the cleanliness of the appellant's home, Captain Guthrie said that was not unusual because he learned the appellant and Mrs. Smith were "very clean." Captain Gutherie acknowledged that in his report, he wrote that the bicycle in the garage was "'teal or green.'" He said that the bicycle in the video footage appeared to be "bluish, aqua-green" but that "you've got to remember, the sun was coming off the cameras, and that's causing a lot of different reflections." He acknowledged that he could not determine the exact color of the bicycle in the video footage or if the bicycle was the one from the appellant's garage. He also acknowledged that he could not say the caps or jacket he removed from the appellant's home were worn by the person riding the bicycle. He said that the Walmart on Rutherford Boulevard was six and one-half miles from the appellant's home and that the person on the bicycle did not appear to be a woman. On redirect examination, Captain Guthrie testified that an eyewitness verified the appellant was riding the bicycle.

Detective Michael Taylor of the MPD testified that about 9:15 p.m on December 6, 2007, he was informed about Marsilene Smith's disappearance. He telephoned the appellant and spoke with him. Given that Mrs. Smith was a diabetic, elderly female and that it was dark outside, Detective Taylor thought she was missing. He tried calling her cellular telephone. The telephone rang, but no one answered, meaning the telephone was still turned on. Detective Taylor contacted Mrs. Smith's cellular telephone provider and asked for information about the approximate location of the telephone. Detective Taylor received information about the location of the cell tower in contact with Mrs. Smith's phone.

Detective Taylor testified that about 6:00 a.m. on December 7, he learned that Mrs. Smith's Navigator had been found at the Walmart on Rutherford Boulevard. He went to the location and met with Captain Guthrie. Detective Taylor said that the vehicle was parked "in kind of an obscure location" between two Budget trucks and that a person going shopping would not have parked it there. Police officers later watched video footage of the parking lot. On the morning of December 8, they asked Mrs. Smith's family to come to the police department to watch the video. The appellant watched the video and confirmed that the Navigator in the video belonged to his wife. However, he said he did not know who was

driving the Navigator or riding the bicycle. That evening, Detective Taylor and other officers went to the appellant's home and searched it pursuant to the appellant's consent. They collected baseball caps, a tan jacket, and a bicycle. On December 10, Detective Taylor interviewed Leah Talbert. She selected the appellant's photograph from a photograph array and identified him as the driver of the Navigator. She also identified him as the person riding the bicycle.

On cross-examination, Detective Taylor testified that a green mountain bike was found a couple of miles from the Walmart on Rutherford Boulevard. He did not remember the tan jacket collected from the appellant's closet being in a dry cleaners bag. He could not say that any of the clothing removed from the appellant's home was worn by the person on the bicycle, and paint scrapings from the bicycle in the appellant's garage did not match paint scrapings collected from the rear of the Navigator. He acknowledged that during the appellant's interview, the appellant told police he had a heart condition and had had hip replacement surgery.

On redirect examination, Detective Taylor testified that he did not learn of any physical disabilities that would have prevented the appellant from walking or riding a bicycle. The appellant had two safes in his home. One safe belonged to the appellant, and the other safe belonged to his daughter. Officers received consent to look in the appellant's safe but not his daughter's safe. Detective Taylor said that the green mountain bike could not have been the bicycle in the Walmart video because the mountain bike was not rideable and its handlebars were different from the bicycle in the video.

Major James Gage of the MPD testified that he was informed of Mrs. Smith's disappearance about 6:00 p.m. on December 6, 2007. The next day, he learned that her Navigator had been found and went to the Walmart on Rutherford Boulevard. About 4:00 p.m., Major Gage and Captain Guthrie went to the appellant's home. Major Gage said the appellant told them that some neighbors were there and that he wanted to "enjoy their company." The appellant asked the officers to leave. Major Gage and Captain Guthrie returned later and spoke with the appellant, who told them that his wife left at 1:30 p.m. the previous day and that she had three to five hundred dollars with her. The appellant allowed the officers to look in his garage, and Major Gage noticed a bicycle. The next morning, December 8, Captain Guthrie and Detective Taylor interviewed the appellant, his daughter, and his son-in-law at the police department. During the appellant's daughter's interview, Major Gage was in his office and overheard the appellant talking with the appellant's son-in-law about money. Major Gage interviewed the appellant and confronted the appellant with the information he overheard. The appellant admitted that his wife had more money with her than he originally told the officers.

On cross-examination, Major Gage testified that the appellant claimed he lied about the amount of money because he failed to report rental income to the Internal Revenue Service. Major Gage acknowledged that the appellant and his family came to the police department voluntarily. He said that the appellant and the appellant's son-in-law were not arguing but that they were having a "stern talk." During the appellant's interview with Major Gage, the appellant said his wife may have had ten thousand dollars with her. The appellant's lying about the money damaged his credibility. Major Gage acknowledged that he did not check the appellant's medical history and that he could not say the bicycle in the appellant's garage was the bicycle in the Walmart video.

The State rested its case, and the appellant presented no proof. During the State's closing, it made the following arguments: The appellant was guilty of count 1, fabricating evidence on December 6, 2007, by using his wife's Lincoln Navigator to lead the police on a "wild goose chase" when he knew the vehicle was in the Walmart parking lot; count 2, fabricating evidence on December 6, 2007, by concealing the Navigator in the Walmart parking lot; count 3, initiating a false report on December 6, 2007, by reporting to Officer Edwards that he last saw his wife in the Navigator at 1:30 p.m., knowing the information was false; count 4, initiating a false report on December 6, 2007, by reporting to Officer Edwards that he last saw his wife in the Navigator at 1:30 p.m., knowing the incident did not occur; count 5, making a false report on December 6, 2007, by reporting to Officer Edwards that he last saw his wife in the Navigator at 1:30 p.m. and that she only had about five hundred dollars with her, knowing the information was false and intending to hinder the investigation; count 6, initiating a false report of emergency on December 6, 2007, by reporting his wife missing, knowing that the report was false and that the police would investigate her disappearance; count 7, making a false report on December 7, 2007, by reporting to Captain Guthrie and Major Gage that he last saw his wife in the Navigator at 1:30 p.m. and that she only had about five hundred dollars with her, knowing the information was false and intending to hinder the investigation; and count 8, making a false report on December 8, 2007, by reporting to Captain Guthrie and Detective Taylor that he last saw his wife in the Navigator at 1:30 p.m. and that she only had about five hundred dollars with her, knowing the information was false and intending to hinder the investigation.

The jury convicted the appellant as charged. During a sentencing hearing, the trial court sentenced the appellant for counts 1 and 2, fabricating evidence, a Class C felony, to four years, six months; for count 3, 4, and 5, initiating a false report, a Class D felony, to three years; for count 6, initiating a false report of emergency, a Class C felony, to four years, six months; for counts 7 and 8, making a false report, a Class D felony, to three years. The trial court ordered that all of the sentences be served concurrently as one year in jail followed by six years on probation. At the conclusion of the hearing, the trial court merged count 2 into count 1 and counts 4 and 5 into count 3.

-7-

The appellant filed a timely motion for new trial and judgment of acquittal. The trial court granted the appellant's motion for judgment of acquittal as to the two fabricating evidence convictions in counts 1 and 2 on the basis that no investigation was pending or in progress when the appellant moved the Navigator into the Walmart parking lot and parked it between the two Budget trucks. The trial court affirmed the appellant's remaining convictions. The State appeals the trial court's granting the appellant's motion for judgment of acquittal in counts 1 and 2, and the appellant counter-appeals the trial court's denying his motion for new trial in counts 3 through 8.

## II. Analysis

### A. State's Appeal - Post-Trial Motion for Judgment of Acquittal

The State contends that the trial court erred by granting the appellant's motion for judgment of acquittal as to his convictions of fabricating evidence in counts 1 and 2. The trial court granted the motion on the basis that no police investigation was pending or in progress when the appellant planted the Navigator in the Walmart parking lot. The appellant contends that the trial court correctly granted his motion for judgment of acquittal. We conclude that the trial court erred by granting the motion and that the evidence is sufficient to support the convictions.

The appellant was convicted in count 1 of fabricating evidence in violation of Tennessee Code Annotated section 39-16-503(a)(2) and in count 2 of fabricating evidence in violation of Tennessee Code Annotated section 39-16-503(a)(1). The statute for tampering with or fabricating evidence provides as follows:

> (a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to:
>
> (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; or
>
> (2) Make, present, or use any record, document or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

Tenn. Code Ann. § 39-16-503(a)(1), (2).

In this case, the indictment specified that the appellant fabricated evidence while an investigation was "pending." After the hearing on the appellant's post-trial motion for judgment of acquittal, the trial court reversed the appellant's convictions, concluding that an investigation was not "pending" when the appellant drove the Navigator into the parking lot and parked it between the two Budget trucks because the police had not been notified of Mrs. Smith's disappearance.

In granting the appellant's motion, the trial court relied on State v. Katrina A. Callahan in which the defendant, who was working at a truck stop, telephoned the store manager and reported that she had been robbed. No. E2002-00926-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 372, at *3 (Knoxville, Apr. 28, 2003). After making the call, the defendant placed a cardboard container over one of the security cameras in the store, took money from the cash register, and telephoned the police. Id. at *4. The defendant later admitted that she conspired with two men to stage the robbery, and a jury convicted her of tampering with or fabricating evidence. Id. On appeal, she challenged the sufficiency of the evidence. Id. at *1. A panel of this court agreed that the evidence was insufficient to support the conviction because an investigation was not pending or in progress when the defendant covered up the camera lens. Id. at **9-10. As this court explained,

> From our de novo review, we cannot agree that the defendant's call to her manager to report a robbery created a pending investigation as encompassed by Code section 39-16-503.
>
> . . . .
>
> We agree with the trial court that obviously an investigation was pending or in progress when the police officers arrived in their official capacity and began investigating the reported robbery. That investigation, however, was not pending or underway at the time that the defendant and her cohorts covered up the camera lens. The statute, we believe, clearly requires the investigation to be pending or in progress at the time the defendant takes whatever action is claimed to constitute tampering with or fabricating evidence. Any other interpretation could lead to absurd results.

Id. at **8-10.

The State contends that the trial court misinterpreted Callahan and that this court is bound by published authority to conclude that an investigation into Mrs. Smith's

disappearance was "pending" when the appellant drove the Navigator into the parking lot and concealed it between the two Budget trucks. Specifically, the State relies on State v. Forbes, 918 S.W.2d 431, 442 (Tenn. Crim. App. 1995), in which this court interpreted "pending," in terms of the statute at issue, "to mean before or during the [investigation or official] proceeding." The State also relies on State v. Reggie Carnell James, No. W2007-00775-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 179, at **23-24 (Jackson, Mar. 10, 2005), in which a panel of this court upheld the defendant's conviction for tampering with evidence when the evidence at trial showed that the defendant murdered the victim, disposed of his body, and destroyed crucial evidence before the police learned about the victim's disappearance and began an investigation.

When reviewing issues of statutory construction, we conduct a de novo review of the trial court's rulings without any presumption of correctness. See Carter v. Bell, 279 S.W.3d 560, 564 (Tenn. 2009). "When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use . . . without reference to the broader statutory intent, legislative history, or other sources." Id. Our goal is to "ascertain and give effect to legislative intent without broadening the statute beyond its intended scope." Id.

Initially, we note that neither Forbes nor James specifically addressed the State's argument in this case, i.e., that an investigation is "pending" when the initial crime is committed, regardless of when the police are notified. Moreover, as noted by the State, this court did not say in Callahan that an investigation becomes "pending" only when the police are notified. Instead, this court concluded that the investigation was not pending when the defendant called her store manager to report the robbery or covered the camera lens, both of which occurred prior to the actual theft from the store. Callahan, No. E2002-00926-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 372, at **8, 9-10. However, we can appreciate the trial court's concluding from this court's analysis in Callahan that the police must be notified in order for an investigation to be "pending." In any event, Callahan is persuasive authority by which we are not bound. See Tenn. Sup. Ct. R. 4(G)(1).

In considering this issue, the Texas Court of Appeals' explanation in Lumpkin v. State, 129 S.W.3d 659 (Tex. Ct. App. 2004), regarding when an investigation is "pending," is particularly helpful. Tennessee's tampering with and fabricating evidence statute is almost identical to Texas Code Annotated section 37.09. In Lumpkin, the Texas court explained as follows:

> At first blush, the terms "pending" and "in progress" appear to be synonymous. Indeed, one definition of the adjective "pending" is "remaining undecided; awaiting decision or settlement; unfinished." RANDOM HOUSE WEBSTER'S

UNABRIDGED DICTIONARY 1433 (2d ed. 2001). However, one of the cardinal principles of statutory construction is that we generally presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible. . . . To avoid redundancy from use of the terms "pending" and "in progress," we look to a second definition of the adjective "pending," which is "about to take place; impending." RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1433 (2d ed. 2001). Construing "pending" as meaning "about to take place, impending" places the Texas statute in harmony with other jurisdictions using the Model Penal Code terminology "believing that an official proceeding [or investigation] is pending or may be [or is about to be or is likely to be] instituted." MODEL PENAL CODE § 241.7; COLO. REV. STAT. ANN. § 18-8-610 (West 2003); D.C. CODE ANN. § 22-723 (2001); FLA. STAT. ANN. § 918.13 (West 2003); KY. REV. STAT. ANN. § 524.100 (Banks- Baldwin 2003); MONT. CODE ANN. § 45-7-207 (2002); OHIO REV. CODE ANN. § 2921.12 (West 2003); UTAH CODE ANN. § 76-8-510.5 (2003). Accordingly, we hold that the term "pending" in the Texas tampering-with-evidence statute means "impending, or about to take place."

Lumpkin, 129 S.W.3d at 663. We are persuaded that the Texas Court of Appeals's reasoning is correct and conclude that "pending" means "impending or about to take place." Once the police are notified, an investigation is "in progress."

We will now consider whether the evidence is sufficient to support the appellant's convictions of fabricating evidence in counts 1 and 2. When an appellant challenges the sufficiency of the convicting evidence, the standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the

-11-

circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

In count 1, the State alleged that the appellant fabricated evidence in violation of Tennessee Code Annotated section 39-16-503(a)(2). Specifically, the indictment alleged that the appellant

> did unlawfully and knowing that an investigation or official proceeding was pending present or use a thing, to-wit: AN AUTOMOBILE, with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding, in violation of T.C.A. 39-16-503.

Taken in the light most favorable to the State, the evidence shows that the appellant contacted the police at 6:00 p.m. on December 6 and told them that his wife was missing. According to the appellant, he last saw his wife at 1:30 p.m. when she left home in her Navigator to go shopping. However, video surveillance of the Walmart parking lot showed that the Navigator entered the parking lot about 2:30 p.m. on December 6 and almost struck Leah Talbert's car. Talbert, who had never met the appellant before December 6, later identified him as the driver of the Navigator. Under these facts and the definition of "pending," we conclude that a reasonable jury could have found that the appellant, knowing that an investigation into his wife's disappearance was impending or about to take place, used the SUV to affect the course or outcome of the police department's investigation.

-12-

Therefore, the trial court erred by granting the appellant's motion for judgment of acquittal in count 1.

In count 2, the State alleged that the appellant fabricated evidence in violation of Tennessee Code Annotated section 39-16-503(a)(1). Specifically, the indictment alleged that the appellant

> did unlawfully and knowing that an investigation or official proceeding was pending alter or conceal any thing, to-wit: AN AUTOMOBILE, with intent to impair its verity or availability as evidence in the investigation or official proceeding, in violation of T.C.A. 39-16-503.

Taken in the light most favorable to the State, the evidence shows that in addition to the facts described above, the appellant parked the Navigator between two large Budget trucks in the rear of the parking lot. Detective Taylor described the location of the Navigator as "obscure" and said that a person going shopping would not have parked it there. On the night of December 6, Officer Edwards asked Officer Norton to look in the parking lot, but Officer Norton did not find the Navigator even though SUV was there. In fact, officers did not find the SUV until early the next morning. Again, we conclude that a reasonable jury could have found that the appellant, knowing that an investigation into his wife's disappearance was impending or about to take place, concealed the SUV to impair its verity or availability as evidence in the police department's investigation. Therefore, the trial court also erred by granting the appellant's motion for judgment of acquittal in count 2. Accordingly, we reverse the trial court's granting the appellant's motion for judgment of acquittal in counts 1 and 2 and reinstate the appellant's convictions in both counts, the merger of the convictions, and the sentence of four years, six months suspended to six years of probation after serving one year in confinement.

### B. Appellant's Counter-Appeal - Sufficiency of the Evidence

Regarding all of the appellant's convictions, he argues that his identity as the driver of the Navigator is insufficient to support the verdicts beyond a reasonable doubt. Specifically, he argues that no forensic evidence linked him to the Navigator or the Walmart parking lot, that Talbert's identification of him as the driver was unreliable, and that the State's case relied almost entirely on circumstantial evidence. In addition, he argues that Captain Guthrie and Detective Taylor gave "patently wrong" testimony when they said that Talbert identified him as the person riding the bicycle. The State claims that the evidence is sufficient. We agree with the State.

-13-

Talbert testified that as her fiancé drove around the Navigator, she looked at the driver. The State asked her if she got a clear look at him, and she said yes. She described him as "probably in his 60's or so," wearing large-framed glasses, and having an oval face and a chin that "kind of came out from his face a little bit." Four days after the incident in the parking lot, Talbert met with Detective Taylor, described the driver, and viewed a photograph array. We have reviewed the array, and the men in the six photographs look very similar to Talbert's description. They also look very similar to each other. Nevertheless, Talbert, who had never seen the appellant before December 6, selected his photograph and identified him as the driver. The jury obviously accredited her testimony. In addition, the State played the Walmart video at trial, and the jury, not this court, had the opportunity to observe the appellant and the bicycle. The evidence was sufficient for the jury to conclude from the direct and/or circumstantial evidence that the appellant drove the Navigator into the Walmart parking lot and that he rode the bicycle away from the vehicle.

Regarding Captain Guthrie's and Detective Taylor's redirect testimony, we agree that Talbert never claimed she saw the bicycle in the parking lot or that she identified the appellant in the video footage as the man on the bicycle. However, for whatever reason, defense counsel did not object to the police officers' testimony and did not cross-examine them about the issue. See Tenn. R. App. P. 36(a).

## C. Appellant's Counter-Appeal - Jury Instruction on "Knowingly"

Next, the appellant contends that the trial court improperly instructed the jury on "knowingly." The State argues that the trial court properly instructed the jury. We conclude that the appellant is not entitled to relief.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). "We must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

During the trial court's instructions to the jury, the trial court gave the pattern jury instruction for "knowingly," stating as follows:

> "Knowingly" means that a person acts knowingly with
> respect to the conduct or to the circumstances surrounding the
> conduct when the person is aware of the nature of the conduct

or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it is shown the defendant acted intentionally.

Relying on State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), the appellant argues that the trial court erred by failing to limit the definition of "knowingly" to the nature-of-conduct language for the fabricating evidence convictions.

In Page, this court stated that "a knowing second degree murder is strictly a 'result-of-conduct' offense. The result of the conduct is the only conduct element of the offense; the 'nature of the conduct' that causes death is inconsequential." 81 S.W.3d at 787 (citing State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). Thus, this court held that the trial court committed reversible error when it included nature-of-the-conduct language in the "knowingly" definition for second degree murder, a result-of-conduct offense. However, in State v. Faulkner, 154 S.W.3d 48, 59 (Tenn. 2005), a first degree murder case, our supreme court concluded that the "superfluous language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly" and, therefore, constituted harmless error.

Tennessee Code Annotated section 39-16-503(a)(1) prohibits a person from altering, destroying, or concealing any "thing" with the intent to prohibit its use as evidence in an investigation while Tennessee Code Annotated section 39-16-503(a)(2) prohibits a person from making, presenting, or using any "thing" with knowledge of its falsity and with the intent to affect the course of the investigation.[1] Under both theories of the tampering with or fabricating evidence statute, the nature of the conduct is punished, regardless of whether the conduct actually results in the unavailability of the evidence or actually affects the outcome of the investigation. Therefore, we agree with the appellant that tampering with and fabricating evidence is a nature-of-the-conduct offense.

However, even if the trial court erred by instructing the jury on both the result-of-conduct and nature-of-the-conduct portions of the "knowingly" instruction, we conclude that the error was harmless. As our supreme court held in Faulkner, the superfluous language

---

[1]We note that the appellant contends in his sufficiency of the evidence argument that the State failed to "establish the identity of the precise 'thing' that [he] altered, concealed, or destroyed, or even that he altered, concealed, or destroyed any 'thing' at all." We find no merit to this claim. The "thing" at issue in this case clearly was alleged in the indictment to be Mrs. Smith's Lincoln Navigator.

given by the trial court did not lessen the State's burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly. Therefore, the appellant is not entitled to relief.

## D. Appellant's Counter-Appeal - New Evidence

The appellant contends that the trial court erred by failing to grant his motion for new trial based on newly discovered evidence. The State argues that the trial court properly denied the appellant's claim of newly discovered evidence. We agree with the State.

The procedural history surrounding this claim is somewhat complex. In the appellant's motion for new trial, he argued that since the trial, he had obtained an affidavit from his neighbor, "showing that she spent the afternoon [of December 6, 2007,] speaking with him and therefore [he] could not have been driving the Lincoln Navigator." On January 24, 2011, the trial court held a motion for new trial hearing. During the hearing, defense counsel argued additional newly discovered evidence in that after the appellant's trial, Dr. Thomas Edwards, a forensic video image analyst, enhanced the Walmart video footage. Counsel claimed that the enhanced footage was "clearer and brighter so that you can actually see who this perpetrator is on the bike." The trial court orally concluded that the appellant failed to prove he was reasonably diligent in obtaining the neighbor's information or the enhanced video. Four days later, the appellant filed a "supplement" to his motion for new trial, claiming that employees of the district attorney's office, the Tennessee Bureau of Investigation (TBI), and Walmart had assured defense counsel before trial that the Walmart video footage could not be enhanced. However, after the appellant's trial, Dr. Edwards enhanced the video and provided it to Detective Taylor. On February 11, 2011, the trial court filed a written order denying the appellant's motion for new trial. In the order, the trial court concluded that the neighbor's affidavit did not constitute newly discovered evidence because the appellant failed to prove that he was reasonably diligent in obtaining the evidence, that his neighbor's statement was material to his case, or that the evidence was likely to change the result of the trial. The written order did not address the appellant's claim regarding the enhanced video.

On February 14, 2011, the trial court held a second hearing on the appellant's motion for new trial in order to allow the appellant to present evidence about the enhanced video. At the hearing, the appellant argued that the TBI was responsible for "improper forensic science and forensic science misconduct" because the enhanced video was the best evidence. Therefore, the TBI should have enhanced the Walmart video before trial. Ethan Highers testified for the appellant that he downloaded the pertinent video footage onto a compact disc (CD). He could not enhance the video and gave the CD to the MPD. He said he spoke with some police officers and "was under the impression that possibly the TBI could enhance it."

Detective Taylor testified that he sent the CD to the TBI and that the TBI "sent us back a still photo in color of a frame of that video and said that that had been enhanced to the best of their ability." Detective Taylor could not see a difference between the enhanced still photograph and the original image. After the appellant's trial, Detective Taylor viewed the video enhanced by Dr. Edwards. The detective said he could not see a difference between the enhanced video and the original video.

The trial court also allowed the appellant to make an offer of proof regarding his neighbor's testimony. Joanne Boyd testified that she saw the appellant in his back yard about 2:00 p.m. on the day his wife disappeared, which Boyd thought was a Sunday. The appellant was working in his flower garden, and Boyd spoke with him briefly. She said he was in the back yard for most of the afternoon. That evening, Boyd heard on the television news that Mrs. Smith was missing. About an hour later, she saw the appellant looking for his dog. The State recalled Detective Taylor as a witness, and he testified that Boyd may have seen the appellant on the afternoon of Thursday, December 6, but that Mrs. Smith's disappearance was not reported on the television news that day. Detective Taylor and other officers spoke with Boyd after Mrs. Smith disappeared. Boyd never reported that she saw the appellant on December 6.

The trial court concluded that the appellant failed to show misconduct by the TBI regarding the video. The trial court also ruled that the appellant failed to show he was reasonably diligent in obtaining the enhanced video because the appellant could have had the video enhanced before trial and could have had Dr. Edwards testify at trial. On appeal, the appellant contends that the enhanced video constitutes newly discovered evidence because defense counsel relied on assurances from the State that the video could not be enhanced. He also argues that he is entitled to a new trial based upon the newly discovered evidence provided by his neighbor.

This court has previously observed that the decision to "[grant or deny] a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996). It is the law of this state that

> a trial court should grant a defendant a new trial on the basis of
> newly discovered evidence when [(1)] the defendant has been
> reasonably diligent in obtaining evidence, [(2)] the materiality
> of the new evidence is apparent, and [(3)] the evidence is likely
> to change the result [of the trial].

State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citations omitted).  All three prongs of the aforementioned test must be met before an appellant is entitled to a new trial based on newly discovered evidence.  See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994).

Initially, we note that the State claims the appellant has waived his claim of newly discovered evidence as to the enhanced video because he filed his supplement after the hearing on his motion for new trial.  See Tenn. R. Crim. P. 33(b) (stating that the trial court "shall liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for new trial").  However, the appellant orally raised the issue during the first hearing, and the trial court orally ruled on the issue.  Therefore, we refuse to hold that the issues has been waived.

We agree with the trial court that the appellant has failed to establish reasonable diligence in attempting to discover Boyd's information or the enhanced video.  Nothing prevented the appellant from presenting his neighbor's testimony at trial, from having the video enhanced before trial, or having Dr. Edwards testify at trial.  Moreover, the appellant has failed to show that the evidence was likely to change the result.  Some of Boyd's testimony during the offer of proof was inconsistent with facts clearly established at trial, seriously calling into question whether she saw the appellant on the day of his wife's disappearance.  Regarding the enhanced video, Detective Taylor testified that he could not see any difference between the enhanced video and the original video.  The appellant introduced the enhanced video into evidence at the February 14, 2011 hearing.  We have viewed the video and also fail to see any significant difference between it and the original video. As Detective Taylor testified, the "enhanced" video is a magnification of the original, but it does not clarify who was riding the bicycle.  Therefore, the trial court did not abuse its discretion by denying the appellant's motion for new trial based on newly discovered evidence.

We note that the appellant also alleges that the probative value of the "blurry and unclear" original video, which the State played for the jury, was substantially outweighed by the danger of unfair prejudice and that he is entitled to plain error relief because the enhanced video was the best evidence in this case.  We find no merit to either claim.  The video footage was highly relevant to the State's case, and we cannot say that  probative value of the video was substantially outweighed by the danger of unfair prejudice.  See Tenn. R. Evid. 403.  As to the appellant's claim regarding the best evidence, Tennessee Rule of Evidence 1002, also known as the best evidence rule, generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording or photograph is required." The rule's purpose is so "only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence."  Neil P. Cohen et al.,

Tennessee Law of Evidence § 10.01[2][a] (6th ed. 2011). In this case, the original video is defined by the rule to be the best evidence. In any event, as we stated previously, we have viewed the enhanced video and can discern no significant difference between it and the original video. Therefore, the appellant is not entitled to plain error relief. See Tenn. R. App. P. 36(b).

### E. Appellant's Counter-Appeal - Brady Violation

The appellant contends that the State violated Brady v. Maryland, 373 U.S. 83, 87 (1963), by failing to provide the defense with the entire twenty-four to thirty-six hours of video that Ethan Highers gave to the MPD. The State argues that the appellant has failed to establish a Brady violation because the State made the video available to the appellant and because the appellant has failed to show that the video was exculpatory. We agree with the State.

At trial, Highers testified that he gave twenty-four to thirty-six hours of video to the MPD. The State played the brief portion of the video that showed the Navigator almost colliding with Talbert's car, the Navigator parking between the Budget trucks, and the person on the bicycle riding away from the Navigator. During Captain Guthrie's testimony, he stated that the video "shows the vehicle coming in. It shows it going to the gas pumps." Defense counsel objected, stating, "I'm going to object to his description of what's on the tape." The trial court sent the jury out, and the State told the court that it was not familiar with the portion of the video the officer was talking about. The State said that it was not going to play that portion of the video or ask the officer about it and agreed that the trial court should sustain defense counsel's objection. Defense counsel told the trial court that the State had not provided counsel with the entire video footage and said, "I don't think he should be allowed to testify about that." The trial court reiterated that it was sustaining defense counsel's objection, and defense counsel stated, "Yes, sir. Thank you."

In the appellant's motion for new trial, he alleged that the State's failure to provide all of the footage violated Brady. The State responded that the appellant knew about the footage and was provided with an opportunity to view and copy the footage. The State also argued that none of the footage was exculpatory. At the motion for new trial hearing, defense counsel told the trial court that the footage still had not been provided to the defense. The prosecutor told the court, "I had told [defense counsel] on several occasions, you can go down there and look at any of these you want to." The State also maintained that "there was absolutely no exculpatory evidence that was withheld." The trial court ruled that the State made the footage available to the defense before trial and that the appellant failed to prove the footage was exculpatory.

In Brady, 373 U.S. at 87, the United States Supreme Court held that the State has a constitutional duty to furnish the defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by the defendant. Specifically, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The State's duty to disclose exculpatory evidence extends to evidence which may be used by the accused for impeachment purposes. Giglio v. United States, 405 U.S. 150, 154-55 (1972).

In order to prove that a violation exists, a defendant must show that (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). The appellant bears the burden of proving a Brady violation by a preponderance of the evidence. Id.

We agree with the trial court that the appellant has failed to prove a Brady violation. Nothing indicates the State suppressed the evidence. To the contrary, the prosecutor told defense counsel about the footage at the MPD. Counsel could have viewed and copied the footage. During the motion for new trial hearing, the prosecutor noted that counsel still had not viewed the footage despite its availability.

Moreover, the appellant has failed to show that the footage was favorable or material. Evidence is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). Regarding materiality, "Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390).

In this case, the appellant has made no attempt to show that the footage was even remotely favorable or material. Therefore, he is not entitled to relief.

We note that within this argument, the appellant claims that Captain Guthrie's testimony about the Navigator being at the gas pumps prior to it being parked at Walmart was relevant impeachment evidence "to which the State decided not to allow." However, it was

defense counsel who objected to the officer's testimony. Therefore, he cannot now complain that the testimony was improperly excluded. See Tenn. R. App. P. 36(a).

### F. Appellant's Counter Appeal - Multiplicity

The appellant argues that the multiplicity of charges in count 3, 4, and 5 stemming from his false statement to Officer Edwards and in counts 6, 7, and 8 stemming from his false reports on December 6, 7, and 8 violated principles against double jeopardy. The State contends that the charges were not multiplicitous. We conclude that the charges in counts 3, 4, and 5 were multiplicitous but that the charges in counts 6, 7, and 8 were not.

After the State's case-in-chief, the appellant argued that the State had improperly charged him with multiple offenses in counts 3, 4, and 5 from his one report to Officer Edwards. The appellant also argued that making several false reports during the course of the investigation constituted only one offense. The appellant asked that the trial court dismiss counts 3 through 8, but the trial court denied the request.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense" State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Multiple convictions for the same offense violate federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. art. I, § 10. In determining whether offenses are multiplicitous, a court should consider the following principles:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
>
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
>
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Phillips, 924 S.W.2d at 665 (footnotes omitted). "Additional factors such as the nature of the act; the time elapsed between the alleged conduct; the intent of the accused, i.e., was a new intent formed; and cumulative punishment may be considered for guidance in determining whether the multiple convictions violate double jeopardy." State v. Epps, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998).

In this case, the indictment alleged in counts 3, 4, and 5 that the appellant filed a false report. Specifically, count 3 alleged that the appellant "did unlawfully and knowingly initiate a statement to a law enforcement officer, to-wit: BOBBY EDWARDS, MPD, concerning an offense or incident within the officer's concern, knowing that the information relating to the offense reported was false, in violation of T.C.A. 39-16-502." Count 4 alleged that the appellant "did unlawfully and knowingly initiate a statement to a law enforcement officer, to-wit: BOBBY EDWARDS, MPD, concerning an offense or incident within the officer's concern, knowing that the offense or incident did not occur, in violation of T.C.A. 39-16-502." Count 5 alleged that the appellant

> did unlawfully and knowingly make a statement in response to a legitimate inquiry by a law enforcement officer, to-wit: BOBBY EDWARDS, MPD, concerning a material fact about an offense or incident within the officer's concern, knowing that such statement was false, with the intent to obstruct or hinder the officer from preventing the offense or incident from continuing to occur, in violation of T.C.A. 39-16-502.

All three counts stemmed from the false information the appellant gave to Officer Edwards at the appellant's home on the evening of December 6. The State used the exact same proof to prove all of the offenses, and the offenses were not separated by time or location. Therefore, we agree with the appellant that the three counts were multiplicitous and that the trial court should have dismissed two of them at the conclusion of the State's case-in-chief.

As to counts 6, 7, and 8, count 6 was based upon the appellant's telephone call to the police department on December 6 and the information he gave to John Flynt. Count 7 was based on false information the appellant gave to Captain Guthrie and Major Gage at the appellant's home on December 7. Count 8 was based on false information the appellant gave to Captain Guthrie and Detective Taylor at the police department on December 8. The three false statements involved different officers, and the appellant made the false statements at different times and locations. Therefore, counts 6, 7, and 8 were not multiplicitous, and the trial court did not err by refusing to dismiss the charges at the conclusion of the State's case-in-chief.

The appellant also contends, without any citation to authority, that with regard to counts 6, 7, and 8, he committed only one offense because "there should only be one (1) charge covering all activities from beginning to end, rather than multiple charges based upon multiple interviews by different members of the same police agency." We disagree with the appellant.

The statute defining filing a false report provides that

(a) It is unlawful for any person to:

(1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:

(A) The offense or incident reported did not occur;

(B) The person has no information relating to the offense or incident reported; or

(C) The information relating to the offense reported is false; or

(2) Make a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false and with the intent to obstruct or hinder the officer from:

(A) Preventing the offense or incident from occurring or continuing to occur; or

(B) Apprehending or locating another person suspected of committing an offense; or

(3) Intentionally initiate or circulate a report of a past, present, or impending bombing, fire or other emergency, knowing that the report is false or baseless and knowing:

(A) It will cause action of any sort by an official or volunteer agency organized to deal with those emergencies;

(B) It will place a person in fear of imminent serious bodily injury; or

(C) It will prevent or interrupt the occupation of any building, place of assembly, form of conveyance, or any other place to which the public has access.

Tenn. Code Ann. § 39-16-502.

In our view, nothing in the statute prevents the State from charging a person with making various false statements throughout an investigation. The statute prohibits initiating a false report, as the appellant did in this case to Flynt, and prohibits making false statements to officers conducting the investigation, as the appellant did to officers on December 7 and 8. Therefore, we conclude that the State could prosecute the appellant separately for the false statements he made on December 6, 7, and 8.

G. Sentencing

The appellant contends that his effective sentence is excessive because the trial court misapplied an enhancement factor and that the trial court erred by not granting his request for full probation. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the sentencing hearing, Kevin Edward Smith, the appellant's and Marsilene Smith's fifty-two-year-old son, testified that the appellant was physically violent toward him when he was a child and a teenager. He said that the appellant whipped and beat him and that the appellant used his hands and fists. The appellant also used belts, boards, and wire to whip his son and left bruises and marks on his son's legs. The appellant was verbally abusive every day. Kevin[2] said that the appellant "slapped . . . around" Marsilene Smith and

_____

[2]Because the witness shares a surname with his mother and the appellant, we will use his
(continued...)

-24-

that she "was scared to death of him." He said that he witnessed the appellant physically abuse his mother seven to ten times but that the appellant "usually timed it to where we weren't around." The appellant also was physically abusive toward Kevin's sister, and Marsilene Smith sheltered her daughter as much as she could. One time, the appellant made Kevin and his sister watch while the appellant used a hammer to kill a litter of puppies. When Kevin turned eighteen years old, he left home and spent five years in the military. In 2004, he learned that his mother was in the hospital. The appellant claimed that his wife fell down the steps. Kevin went to the hospital immediately and saw that his mother's head and eyes were swollen. He said he took photographs of her in the hospital and the staircase at his parents home because "I knew that wasn't what happened. He almost killed her that day." The photographs were introduced into evidence. They show bruises and swelling on Mrs. Smith's eyes and forehead; cuts and scratches on her cheeks, lower face, and chin; and dried blood around her right nostril and the right corner of her mouth.

On cross-examination, Kevin denied being dishonorably discharged from the Navy for using drugs. He acknowledged that doctors did not contact the police about his mother's injuries and that the appellant was not charged with a crime. He also acknowledged that photographs of the staircase showed framed pictures on the floor, where the appellant claimed his wife fell. Kevin acknowledged that he never reported any physical abuse to his teachers and never reported the abuse of his mother to the police. He also acknowledged that he had not spoken with the appellant in years and that he hated the appellant.

On redirect examination, Kevin testified that he was not lying. He said he did not report the abuse to authorities because "I thought it was normal."

Teresa Goodwin testified that she worked in a hair salon in Murfreesboro. One night in March 2008, Goodwin went to a bar and sat down next to a man, who turned out to be the appellant. They had a general conversation, and Goodwin told the appellant where she worked. The next day, the appellant came to the hair salon for a haircut. He told Goodwin that his wife was missing, and he asked Goodwin to go out with him. Goodwin told the appellant she was not interested, but the appellant began telephoning Goodwin at work. The appellant telephoned Goodwin three to five times per day for one or two weeks. She said that the appellant was "creeping [her] out" and that she told him to stop calling her. Finally, Goodwin contacted the police and filed a complaint against the appellant. The appellant stopped calling Goodwin.

---

[2](...continued)
first name for clarity.

Major Gage testified that about ten officers spent two hours each investigating Marsilene Smith's disappearance from the time the Navigator was located at Walmart until it was processed at the MPD. The investigation cost $619.47 in officer pay.

Special Agent Charles Hardy of the TBI testified that officers from the TBI processed the Navigator. The expense for processing the vehicle was $2,808.

Kyle Evans, the Public Information Officer for the MPD, testified that he was responsible for the daily dissemination of police reports and interacted with the media on a daily basis. The disappearance of Marsilene Smith received a tremendous amount of publicity. The story received local and national attention. Evans said people in the community still asked him about the case.

The State introduced the appellant's presentence report into evidence. According to the report, the then seventy-four-year-old appellant graduated from high school in 1954, attended some college classes, and entered the Marines in 1956. He married Marsilene Smith in 1957, and they had two children. In the report, the appellant described his physical and mental health as "fair," stating that he suffered from memory loss due to an automobile accident, asthma, COPD, and high blood pressure; had had two heart attacks, heart surgery, and a hip replacement; and took many medications for his ailments. The appellant stated in the report that he had never used illegal drugs but that he began drinking alcohol when he was twenty years old and still drank alcohol occasionally. The appellant said that he had worked for Texas Gas Transmission Corporation as a machinist for thirty-three years and that he had been retired for nineteen years. The report shows no criminal history for the appellant. However, in the report, he said that he was arrested previously for domestic violence, that he attended "abuse school," and that the charge was dismissed. The presentence investigating officer asked the appellant about an allegation of harassment. According to the report, the appellant told the officer that he telephoned a woman twice, that she asked him to stop, and that he stopped calling her. He claimed the incident occurred about one year after his wife's disappearance.

The trial court applied enhancement factor (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," based upon the appellant's telephone calls to Teresa Goodwin. See Tenn. Code Ann. § 40-35-114(1). In mitigation, the trial court considered the appellant's lack of a prior criminal record. See Tenn. Code Ann. § 40-35-113(13). For the appellant's two convictions of fabricating evidence and one conviction of filing a false report of an emergency, Class C felonies, the trial court sentenced the appellant as a Range I, standard offender to four and one-half years, the midpoint in the range. See Tenn. Code Ann. § 40-35-112(a)(3). For the appellant's five counts of filing as false report, Class D

felonies, the trial court sentenced the appellant to three years, the midpoint in the range. See Tenn. Code Ann. § 40-35-112(a)(4).

Regarding the appellant's request for full probation, the trial court determined that based upon the presentence report, the appellant's physical and mental condition, the facts and circumstances of the case, the nature of the offenses, the appellant's lack of a prior criminal history, and the need for deterrence, the appellant's sentence should be suspended to six years of probation after serving one year in confinement.[3] The trial court also ordered that the appellant pay restitution in the amounts of $619.47 and $2,808. Finally, the trial court merged count 1 into count 2 and counts 4 and 5 into count 3.

Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

---

[3]Pursuant to Tennessee Code Annotated section 40-35-303(c)(1), the trial court extended the appellant's probation to six years, the maximum punishment for a range I, standard offender convicted of a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(3).

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant contends that the trial court erred by applying enhancement factor (1) because the State failed to show that the prior criminal behavior occurred. The trial court apparently applied factor (1) based only upon the appellant's contacting Teresa Goodwin. The trial court obviously accredited Goodwin's testimony that the appellant harassed her. Therefore, we cannot say that the trial court erred by applying enhancement factor (1).

Regarding the trial court's denial of the appellant's request for full probation, an appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The appellant's sentences meet this requirement. Additionally, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). Moreover, as set forth in Tennessee Code Annotated section 40-35-103(1), sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Furthermore, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

In the instant case, the trial court imposed a sentence of split confinement, which is an alternative sentence. See Tenn. Code Ann. § 40-35-306(a); State v. Williams, 52 S.W.3d 109, 120 (Tenn. Crim. App. 2001). However, "[t]he determination of whether the appellant is entitled to an alternative sentence and whether the appellant is entitled to full probation are different inquiries." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Therefore, an appellant seeking full probation bears the burden of establishing his suitability for full probation. Id.; see also Tenn. Code Ann. § 40-35-303(b). To prove his suitability, the appellant must establish that granting full probation will "subserve the ends of justice and the best interest of both the public and the [appellant]." State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (internal quotation marks and citation omitted), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000). Moreover,

[i]n determining one's suitability for full probation, the court may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes.

Boggs, 932 S.W.2d at 477.

The trial court considered the factors stated above and determined that the appellant was not entitled to full probation. One of those factors was that deterrence was necessary because the case received substantial publicity beyond that normally expected in the typical case. See State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2001). Upon our de novo review, we also conclude that the appellant's deceit regarding his wife's disappearance is an indicator

-29-

of his poor potential for rehabilitation. We conclude that the trial court properly denied the appellant's request for full probation.

## H.  Appellant's Counter-Appeal - Cumulative Effect of Errors

Finally, the appellant contends that the cumulative effect of the errors warrants a new trial. However, we conclude this claim has no merit.

## III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by granting the appellant's motion for judgment of acquittal and reinstate his convictions of fabricating evidence in counts 1 and 2, the merger of the convictions, and the sentence of four years, six months suspended to six years of probation after serving one year in confinement. We also conclude that the trial court should have dismissed the charges of filing a false report in counts 4 and 5 due to their multiplicity with count 3. Therefore, the appellant's convictions in counts 4 and 5 are reversed, and the charges are dismissed. The appellant's remaining convictions and sentences for filing a false report in counts 6, 7, and 8 are affirmed.

_____
NORMA MCGEE OGLE, JUDGE

-30-